RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0069p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

DANIEL ROUSTER, as Personal Representative of the
Estate of Jerry Rouster, Deceased,

*Plaintiff-Appellant*,

*v.*

COUNTY OF SAGINAW, et al.,

*Defendants*,

SECURE CARE, INC., CATHLEEN CONLEY, RMA;
STELLA MENCHACA, LPN, and DEBRA MARRS, LPN,

*Defendants-Appellees*.

No. 13-1673

---

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City
No. 1:11-cv-10986—Thomas L. Ludington, District Judge.

Argued: January 28, 2014

Decided and Filed: April 9, 2014

Before: MOORE and COOK, Circuit Judges; GWIN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Christopher P. Desmond, JOHNSON LAW, PLC, Detroit, Michigan, for Appellant. Susan J. Zbikowski, SIEMION HUCKABAY, P.C., Southfield, Michigan, for Appellees Secure Care, Menchaca, and Marrs. R. Paul Vance, CLINE, CLINE & GRIFFIN, P.C., Flint, Michigan, for Appellee Conley. **ON BRIEF:** Ven R. Johnson, JOHNSON LAW, PLC, Detroit, Michigan, for Appellant. Susan J. Zbikowski, SIEMION HUCKABAY, P.C., Southfield, Michigan, for Appellees Secure Care, Menchaca, and Marrs. J. Brian MacDonald, CLINE, CLINE & GRIFFIN, P.C., Flint, Michigan, for Appellee Conley.

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   While being held in Saginaw County Jail ("Saginaw"), Jerry Rouster ("Jerry") succumbed to sepsis and died as a result of a perforated duodenal ulcer.   Before his death, he complained of stomach pain, engaged in bizarre behaviors indicative of mental-health problems, and displayed signs of agitation.   His brother, Daniel Rouster ("Rouster"), as representative of Jerry's estate, brought suit under 42 U.S.C. § 1983 against the medical staff who interacted with Jerry during the final thirty-six hours of his life, alleging that they were deliberately indifferent to his medical needs.   It is unfortunate that Jerry died when prompt medical attention could have saved his life.   However, we cannot conclude that the medical staff became aware of Jerry's serious medical need and deliberately refused to provide appropriate treatment.   Accordingly, we AFFIRM the judgment of the district court.

## I. BACKGROUND

On May 7, 2007, Jerry Rouster was arrested on a misdemeanor charge of contempt of court for failing to pay court fines related to an incident of driving on a suspended license.   He was brought to Saginaw to be held pending an appearance in court.   The arresting officer did not notice any obvious signs that Jerry was intoxicated, such as bloodshot eyes, slurring of speech, or the odor of alcohol on Jerry's breath.   R. 99-3 (Lutz Dep. at 24) (Page ID #1858).   However, the individual who conducted Jerry's intake screening at Saginaw noted that he was "[u]nder the influence of drugs/alcohol."   R. 95-2 (Intake Screening Form) (Page ID #900).   Jerry was placed in a "general population" cell with several other inmates until he appeared before a judge on the morning of May 9.   The judge sentenced Jerry to an additional three days in jail, and Jerry returned to a general population cell.

### A.  The First Shift – Cathleen Conley

At approximately 8:00 on the evening of May 9, Jerry began complaining of stomach pains and abdominal cramping.   A corrections officer ("CO") called Cathleen Conley, the

Registered Medical Assistant ("RMA")[1] on duty, to see Jerry in the general population cell. When Conley arrived, Jerry was lying on the floor. R. 95-3 (Conley Dep. at 29) (Page ID #942). He did not respond to her questions about how he was feeling, and he would not get up off the floor to speak to her or show her any identification. *Id.* at 31–33 (Page ID #944–46). Pursuant to Saginaw procedure, Conley was not permitted to enter the general population cell to examine Jerry where other inmates were present. *Id.* at 31 (Page ID #944). Therefore, Conley asked the COs to bring Jerry to the medical department when he got up. A few minutes later, Jerry walked into the medical clinic. *Id.* at 34 (Page ID #947).

Upon entering the clinic, Jerry protested that he did not want to be there, but he eventually submitted to Conley's examination and assessment. *Id.* Conley noted on Jerry's medical chart that his pain from "cramping" was "between moderate and severe." *Id.* at 37 (Page ID #950). She also noted that Jerry reported that his last bowel movement had been on the morning of May 9, and that it had been "like H2O," but that he was not experiencing nausea or vomiting. R. 100-7 (Conley Notes) (Page ID #2055). Upon palpating Jerry's abdomen, Conley noted no distension or rebound tenderness, and she observed that his bowel sounds were normal. *Id.* She did notice, however, that Jerry was "guarding" (*i.e.*, that his abdominal muscles were "flexed [and] wouldn't unflex"). *Id.* She attributed the flexing of his muscles to his attempts to sit up: "He was fighting me. He was trying to get up off the table." R. 95-3 (Conley Dep. at 39–40) (Page ID #952–53). Conley concluded that Jerry suffered from "abdominal pain, gas and diarrhea." R. 100-7 (Conley Notes) (Page ID #2055). She gave him Tums and advised him to increase his fluid intake and lie on his side. *Id.* At no time during this examination did Jerry describe any medical history. After receiving the over-the-counter medication, Jerry returned to the general population cell.

Just before midnight, when Conley was walking past Jerry's cell, she observed him using the toilet. She asked him if he was still experiencing any cramping, but he did not respond. R. 95-3 (Conley Dep. at 48) (Page ID #961). She concluded that the cramps had "resolved

---

[1]A medical assistant has less formal education and training than a licensed practical nurse, and neither is permitted to make an independent medical decision. R. 97-14 (Goldenson Dep. at 39) (Page ID #1800). Secure Care, Inc., defendant-appellee in this case, is a private company that provides medical services to Saginaw, including scheduling the medical personnel sued as individual defendants in this case. R. 1 (Compl. ¶ 7) (Page ID #3).

themselves." R.100-7 (Conley Notes) (Page ID #2057). At approximately 12:30 on the morning of May 10, the COs informed Conley that Jerry had vomited. R. 95-3 (Conley Dep. at 50) (Page ID #963). She returned to his cell, but she did not observe him vomiting. *Id.* When Conley asked Jerry whether he had an alcohol or drug abuse problem, Jerry denied abusing alcohol and drugs. *Id.* Jerry did not complain about cramping or abdominal pain at this time.

Approximately thirty minutes later, the guards informed Conley that Jerry was eating the leftover food from the bag lunches given to the inmates from off the floor of the cell. *Id.* at 51 (Page ID #964). When Conley returned to the cell to check on Jerry, he was no longer eating food from the ground. However, Jerry complained of cramping again. *Id.*

At approximately 2:00 in the morning, the other inmates housed in Jerry's general population cell reported to the COs that Jerry was drinking out of the toilet. Id. at 53 (Page ID #966). At this point, Conley became concerned about Jerry's mental-health status. Id. at 54 (Page ID #967). She moved him to an observation cell, where the COs could easily observe him on a closed-circuit monitor. Id. at 55 (Page ID #968). Conley did not interact with Jerry again before her shift ended at 6:00 on the morning of May 10, but she testified that it would have been her "usual practice" to check the monitor periodically. Id. at 56–57 (Page ID #969–70). At no point during her shift did she call Dr. Natole, the on-call physician. Conley explained that she had not observed any of Jerry's bizarre behaviors herself, and that she could not "call a doctor with assumptions." Id. at 54 (Page ID #967).

## B. The Second Shift – Debra Marrs

At 6:00 on the morning of May 10, Debra Marrs, a Licensed Practical Nurse ("LPN") came on duty to relieve Conley. Conley reported to Marrs that she had placed Jerry under observation because the guards and inmates had witnessed his bizarre behaviors. R. 95-4 (Marrs Dep. at 74) (Page ID #1007). Conley also testified that she relayed information regarding Jerry's abdominal cramping, but Marrs could not remember if Conley discussed Jerry's stomach pain with her. *Id.* at 76 (Page ID #1007); R. 95-3 (Conley Dep. at 58) (Page ID #971). Throughout the morning, Marrs observed Jerry in the observation cell and noted nothing unusual. During the afternoon, a CO told Marrs that he personally knew that Jerry "drinks a lot." R. 95-4 (Marrs Dep. at 92) (Page ID #1011). Based on this information, Marrs thought that alcohol abuse might

explain the bizarre behaviors Conley had described.  *Id.* at 93 (Page ID #1011).   At approximately 2:45 on the afternoon of May 10, Marrs performed an alcohol withdrawal assessment ("CIWA").  R. 100-14 (Marrs Notes) (Page ID #2111).  She noted several aberrant symptoms:  Jerry was experiencing moderate hand tremors, he was disoriented (*e.g.*, he believed that the year was 1999 instead of 2007), and he was displaying "moderately anxious or guarded" behaviors.  R. 95-4 (Marrs Dep. at 104, 123–24) (Page ID #1014, 1019).  After scoring Jerry's symptoms, Marrs calculated a total CIWA score of fifteen.[2]

Upon concluding that Jerry was likely experiencing alcohol withdrawal, Marrs called Dr. Natole.  She is unsure if she told Dr. Natole about Jerry's abdominal complaints, and Dr. Natole is unable to recall if Marrs described those symptoms.  *Id.* at 114–16 (Page ID #1017); R. 97-12 (Natole Dep. at 59–61) (Page ID #1740–41).  However, both Marrs and Dr. Natole agree that Marrs reported Jerry's CIWA score and that Dr. Natole prescribed Librium to treat his withdrawal symptoms.  R. 95-4 (Marrs Dep. at 105–18) (Page ID #1014–18); R. 97-12 (Natole Dep. at 33–34) (Page ID #1734).  Ordinarily, an inmate who received a CIWA score greater than fifteen would be sent to the hospital for closer monitoring.  R. 97-12 (Natole Dep. at 65–66) (Page ID #1742).  However, because Jerry's score was just below that point, he was kept at Saginaw for treatment.  Marrs administered the prescribed medication and kept Jerry under observation in a separate cell.  At some point later in Marrs's shift, she noticed that he was lying behind the privacy partition in the observation cell.  Marrs and a CO helped to move Jerry away from the privacy partition so that they could observe him more easily.  R. 95-4 (Marrs Dep. at 156–57) (Page ID #1027).  Jerry did not complain to Marrs that he was experiencing abdominal discomfort at any time during her twelve-hour shift.  *Id.* at 158–59 (Page ID #1028).  Nor did Marrs observe any behaviors that would indicate to her that he was in pain (*e.g.*, rubbing his stomach or lying in a fetal position).  *Id.* at 161–62 (Page ID #1028–29).

## C.  The Third Shift – Cathleen Conley and Stella Menchaca

When Marrs's shift ended at 6:00 on the evening of May 10, Stella Menchaca, an LPN, and Conley took over for the night shift.  Marrs reported that she had started treating Jerry for

---

[2]It appears that Marrs miscalculated:  according to the notations on the CIWA assessment, Jerry actually scored a 13.  R. 100-14 (Marrs Notes) (Page ID #2111).

alcohol withdrawal.  R. 95-3 (Conley Dep. at 60) (Page ID #973).  Conley also told Menchaca about Jerry's abdominal complaints and the bizarre behaviors that had led her to place him in the observation cell.  R. 97-13 (Menchaca Dep. at 69) (Page ID #1766).  At 7:30, Menchaca delivered Jerry's medication and conducted a second CIWA.  She noted that his skin was "cool to touch," that he had a "slight tremor," and that his "gait [was] unsteady."  R. 100-16 (Menchaca Notes) (Page ID #2127).  She also observed that he was mumbling and talking to himself.  R. 97-13 (Menchaca Dep. at 106) (Page ID #1776).  When she asked Jerry how his stomach was feeling, he denied that he was in pain.  *Id.* at 111–12 (Page ID #1777).  She also observed Jerry reaching up high and bending over, and concluded that he did not have "an acute abdomen."  *Id.* at 114 (Page ID #1178).  Based on her observations, she believed that "he was probably in a state of withdrawal."  *Id.* at 109 (Page ID #1776).

At approximately 1:30 on the morning of May 11, Conley gave Jerry the medication prescribed by Dr. Natole and conducted a third CIWA.**3**  On the form, Conley noted that Jerry "still [complained of] stomach pains [and] state[d that he] wants to go home."  R. 100-7 (Conley Notes) (Page ID #2061).  Victor Gomez, a CO near Jerry's cell at the time, reported that Jerry looked pale and sick, that it was clear he was in pain, and that he was obviously getting worse.  R. 99-18 (Gomez Dep. at 99–100, 118) (Page ID #1970–72).  However, Conley observed that "he was very strong at that time" and that "[h]e was pushing on the door . . . trying to get out."  R. 95-3 (Conley Dep. at 65–66) (Page ID #978–79).  Shortly thereafter, both Menchaca and Conley observed Jerry kicking at the glass walls of his cell and picking at screws in the door.  He did not complain of abdominal pain or exhibit any behaviors that indicated he was in pain.

At 5:45 on the morning of May 11, 2007, less than thirty-six hours after he first began to make medical complaints, Jerry was found dead in the observation cell.  Medical examiners determined that Jerry had a perforated duodenal ulcer, which had begun bleeding and leaking toxic materials into his stomach; he eventually became septic and died.  Jerry had been surgically treated for an upper gastrointestinal bleed from the same ulcer the previous August.  R. 96-6

---

**3**Conley did not record her observations on a CIWA form until her shifted ended, which was after Jerry had died in the observation cell.  R. 95-3 (Conley Dep. at 62–63) (Page ID #975–76).

(Hosp. Records) (Page ID #1284–87).  However, at no point did Jerry inform any medical staff member or other prison official about his history of treatment for an ulcer.

After Jerry's death, Daniel Rouster, as the personal representative of Jerry's estate, filed a complaint against Conley, Marrs, Menchaca, and Secure Care, as well as several other defendants, alleging that their denial of medical treatment for Jerry's serious medical needs constituted cruel and unusual punishment, that Secure Care had failed to train employees adequately to detect serious medical problems, and that they were liable under state law for medical malpractice.  R. 1 (Compl.) (Page ID #1–20).  In his amended complaint, Rouster added a claim for ordinary negligence.  R. 3 (Am. Compl.) (Page ID #58–80).  Rouster settled with five of the defendants, including the county, and the district court dismissed two others.  R. 72 (Order Approving Partial Settlement) (Page ID #759–63); R. 73 (Order Dismissing Natole) (Page ID #764).  Conley, Marrs, Menchaca, and Secure Care remained as defendants, and the parties proceeded to discovery.

**D.  Medical Expert Testimony**

During discovery, the parties retained medical experts to give opinions regarding the significance of Jerry's medical symptoms and the treatment provided by the medical staff at Saginaw.  The experts gave varying opinions on whether Jerry's symptoms were consistent with those of patients experiencing alcohol withdrawal.  One expert opined that "[a]bdominal pain is not a usual part [of withdrawal].  Muscular cramps are, but abdominal pain, in my experience, is not a usual part."  R. 99-6 (Gouge Dep. at 34) (Page ID #1879).  However, another expert believed that abdominal pain and vomiting are consistent with alcohol withdrawal.  R. 95-5 (Tennessen Dep. at 107) (Page ID #1081); *see also* R. 97-12 (Natole Dep. at 40) (Page ID #1735).  Other symptoms of alcohol withdrawal identified by the experts include hallucinations, R. 95-5 (Tennessen Dep. at 107) (Page ID #1081) and other changes in mental status.  R. 97-12 (Natole Dep. at 42–43) (Page ID #1736).  However, no expert stated that the bizarre behaviors Jerry engaged in were indicative of alcohol withdrawal.  R. 95-5 (Tennessen Dep. at 139) (Page ID #1089).  Nonetheless, they concluded that, if Jerry had been suffering from withdrawal, he was treated appropriately.  R. 97-14 (Goldenson Dep. at 92) (Page ID #1813).

Although they disagreed about whether certain of Jerry's symptoms were consistent with alcohol withdrawal, the medical experts were unanimous in their opinion that the medical personnel who interacted with Jerry provided substandard care. At a basic level, Conley, Marrs, and Menchaca were not trained to assess and diagnose patients. Valerie Tennessen, the R.N. who testified to the appropriate standard of care for nurses, explained: "RMAs do not assess. LPNs do not assess. All they do is gather information and pass it along. They don't get to make a nursing diagnosis." R. 95-5 (Tennessen Dep. at 40–41) (Page ID #1064–65). Indeed, because Conley was only an RMA, she lacked the medical knowledge to understand the symptoms she observed and the medical terms on the assessment forms. *Id.* at 135 (Page ID #1088). However, even the medical experts who opined that RMAs and LPNs lacked the credentials to assess or diagnose patients conceded that they would need to screen patients to determine whether they had a significant medical problem that should be evaluated by a doctor. R. 97-14 (Goldenson Dep. at 108) (Page ID #1817).

Regardless of whether the RMAs and LPNs who saw Jerry were qualified to assess Jerry as having mild digestive complaints or alcohol withdrawal, the experts believed that Jerry exhibited several symptoms that should have alerted the nursing staff that a physician should be called immediately. One expert testified that a physician should be called to evaluate any patient who experiences "significant abdominal pain." R. 99-6 (Gouge Dep. at 40) (Page ID #1881); *see also* R. 97-14 (Goldenson Dep. at 69–70) (Page ID #1808). Another explained that a nurse who observed an inmate eating off of the floor or drinking from the toilet should have seen it as a "[b]ig red flag" and immediately called a doctor. R. 95-5 (Tennessen Dep. at 139) (Page ID #1089).

In addition to the failure to contact a physician immediately, the experts were also critical of the other steps the nursing staff took in caring for Jerry. They explained that, although it was appropriate to remove Jerry from the general population cell once he began exhibiting bizarre behaviors, the medical staff should have done more. R. 95-5 (Tennessen Dep. at 85–87) (Page ID #1076); R. 97-14 (Goldenson Dep. at 55–56) (Page ID #1804). One expert opined that the failure to contact a physician when Jerry was placed in the observation cell was "absolutely" a breach of the standard of care. R. 95-5 (Tennessen Dep. at 85–88) (Page ID #1076). In addition,

when the medical staff did personally observe Jerry in his cell, their assessments were inadequate. Merely watching Jerry sit in his cell was not sufficient to assess his condition; instead, the medical attendants were obligated to go into the cell themselves or have Jerry walk over to the door and communicate with them. *Id.* at 123–24 (Page ID #1085). Ultimately, the medical experts generally concluded that the treatment provided by the medical staff fell far short of the optimal standard of care.

**E. Procedural History**

After the completion of discovery, Conley, Marrs, Menchaca, and Secure Care, as the only remaining defendants, moved for summary judgment. R. 95 (Conley Mot. for Summ. J.) (Page ID #870–97); R. 97 (Marrs, Menchaca, and Secure Care Mot. for Summ. J.) (Page ID #1493–1519). The district court granted summary judgment in favor of all four defendants, concluding that "no facts establish that [the defendants] subjectively knew that Mr. Rouster faced a substantial risk of serious harm and consciously disregarded that risk." R. 108 (D. Ct. Op. at 29) (Page ID #2247). The district court reasoned that there was no direct evidence that any of the defendants knew that Jerry's stomach pain indicated a serious medical risk. Nor was there circumstantial evidence that "the risk was so obvious that Defendants must have known of the risk." *Id.* at 31–32 (Page ID #2249–50). Because the defendants misdiagnosed Jerry and treated him for the wrong ailment, their actions might support a negligence claim; however, the district court determined that the allegations did not support a constitutional claim. *Id.* The district court also granted summary judgment in favor of Secure Care on the claim for failure to train, concluding that Rouster was unable to pursue a municipal-liability theory because he had not shown that Jerry's constitutional rights were violated. *Id.* at 33 (Page ID #2251). After granting summary judgment on both federal claims, the district court declined to exercise supplemental jurisdiction over the remaining state claims. *Id.* at 34 (Page ID #2252). This timely appeal followed.

## II. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 894 (6th Cir. 2004). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In determining whether there is a "genuine issue for trial," we interpret the facts and draw all reasonable inferences therefrom in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  DELIBERATE INDIFFERENCE

Rouster asserts a claim under 42 U.S.C. § 1983, arguing that the three members of the nursing staff who attended to Jerry while he was held at Saginaw were each deliberately indifferent to his medical needs. To assert a cause of action arising under § 1983, a plaintiff must demonstrate a deprivation of a constitutional right caused by a state government official. The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation and quotation marks omitted). The Eighth Amendment protection against deliberate indifference extends to pretrial detainees in state prisons by operation of the Due Process Clause of the Fourteenth Amendment. *Blackmore*, 390 F.3d at 895. However, because the Eighth Amendment prohibits cruel or unusual *punishment*, an official must have actually perceived a significant risk to an inmate's health to have violated his constitutional right: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994); *see also Wilson v. Seiter*, 501 U.S. 294, 300 (1990).

Accordingly, an Eighth Amendment inquiry has two components, one objective and one subjective. A plaintiff satisfies the objective component by alleging that the prisoner had a medical need that was "sufficiently serious." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). It is clear that Jerry suffered from a serious, indeed dire, medical need while he was held at Saginaw. He had a perforated duodenum, which leaked toxic materials into his abdominal cavity and caused internal bleeding. Jerry was held at Saginaw for only a few days,

but within that time he succumbed to sepsis and died.   Clearly then, Jerry had an objectively serious need for medical treatment.  *See Blackmore*, 390 F.3d at 897.

The central question in this appeal is whether Rouster has provided sufficient evidence to prove the subjective component of the deliberate-indifference inquiry.   A plaintiff satisfies the subjective component by "alleg[ing] facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  The subjective requirement is designed "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment."  *Id.* (citing *Estelle*, 429 U.S. at 106).   We have described the mental state of a prison official who has been deliberately indifferent to a prisoner's medical needs as akin to recklessness:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.  On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result."  Instead, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."

*Id.* (internal citations omitted) (quoting *Farmer*, 511 U.S. at 835–36).   The plaintiff bears the burden of proving subjective knowledge, but he may do so with ordinary methods of proof, including by using circumstantial evidence.  *Farmer*, 511 U.S. at 842.  Indeed, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id.*   Bearing these principles in mind, we turn to addressing whether Rouster can prove the subjective component of his claim as to each of the medical attendants who interacted with Jerry.  *See Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (explaining that each defendant's subjective knowledge should be assessed separately, and that information available to one defendant may not be automatically imputed to the others).

## A. Cathleen Conley

Rouster argues that Conley had subjective knowledge of Jerry's need for medical treatment because she had examined him for his abdominal complaints and was aware of his bizarre behaviors. Specifically, Conley knew by the end of her first shift (1) that Jerry had complained of stomach cramping, (2) that he displayed abdominal "guarding," (3) that he had diarrhea, (4) that the COs had observed him vomiting, (5) that he had been observed eating leftover food from the floor, and (6) that other inmates had observed him drinking from the toilet. During her shift the next evening, she also learned (7) that twenty-four hours after Jerry first experienced abdominal pain he again complained of stomach cramping. Based upon this knowledge, Rouster asserts that Jerry's serious medical need was so obvious that Conley must have been subjectively aware of it, *see Farmer*, 511 U.S. at 842, and that she consciously disregarded Jerry's needs by failing to contact a physician or provide appropriate treatment.

There are three critical points during Conley's interactions with Jerry when she might have become aware that he suffered from a serious medical condition and needed treatment: (1) during her initial examination of Jerry in the medical clinic, (2) after she was notified that Jerry had been seen drinking from the toilet, and (3) during her second shift, when Jerry again complained to her of stomach cramping. First, we cannot conclude that Conley was subjectively aware of Jerry's serious medical need at the time she initially examined him in response to his abdominal complaints. After her examination, Conley knew that Jerry suffered from stomach pain and diarrhea, and that his abdominal muscles were flexed and would not unflex. Although the symptoms Jerry was exhibiting could well have indicated a serious medical condition, Conley interpreted the symptoms as indicative of a relatively minor condition. She concluded that Jerry suffered from gas and diarrhea, and she treated him accordingly.

"[C]ourts are generally reluctant to second guess the medical judgment of prison medical officials." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944 (6th Cir. 2010); *see also Comstock*, 273 F.3d at 703 (noting that a prison medical official who merely provides careless or inefficacious treatment has not been deliberately indifferent to a prisoner's needs). In *Jones*, a doctor examined a prisoner who complained of sharp stomach pains, rapid weight loss, and other bowel complaints, and concluded that he suffered from severe constipation. The doctor

prescribed an over-the-counter medication to relieve the prisoner's symptoms. However, when the prisoner was later treated at a hospital, the doctors determined that his symptoms were caused by cancer. In finding summary judgment in favor of the prison doctor appropriate, we reasoned:

> Dr. Deitrick's initial diagnosis and treatment of Jones with a laxative seems inappropriate in light of Jones's substantial weight loss and sharp stomach pain; however, Jones had indicated an inability to have a bowel movement for several days and other stomach pains, which could have been consistent with Dr. Deitrick's diagnosis of obstipation. Even though Dr. Deitrick's initial diagnosis was incorrect, negligence in diagnosing a medical condition does not constitute unconstitutional deliberate indifference.

*Id.* at 945 (internal quotation marks omitted). Conley's interaction with Jerry closely parallels the circumstances described in *Jones*: she assessed his symptoms (*e.g.*, cramping and diarrhea) and misdiagnosed him as suffering from gas and diarrhea.

Furthermore, Rouster acknowledges that Conley did provide some level of treatment in response to Jerry's complaints. Conley immediately evaluated him after receiving a report that his stomach was cramping, and then provided him with over-the-counter medication to treat appropriately the relatively minor stomach ailment that she diagnosed. Rouster argues that such a minimal response to serious medical needs is constitutionally deficient: "'[A] prisoner is not required to show that he was literally ignored by the staff' to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)); *see also Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) ("[W]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.") (internal quotation marks omitted); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (noting that "[o]f course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all").

Had Conley been subjectively aware of the seriousness of Jerry's medical condition, her decision to treat him only with over-the-counter medication might have been so cursory as to amount to a conscious disregard of his needs. However, Rouster has not shown that Conley was in fact aware that Jerry had a serious medical need. Indeed, Conley did not have one very critical

piece of information, which might have allowed us to draw such a conclusion:  she did not know that Jerry had been treated the previous year for a perforated duodenal ulcer.  *Cf. Westlake*, 537 F.2d at 859 (concluding that a prisoner stated a claim of deliberate indifference because prison officials provided no treatment even after the prisoner informed them that he suffered from an ulcer and needed medication and a special diet).  It is true that the medical experts retained in this case testified that Conley should have called a physician whenever any inmate complained of "significant abdominal pain."  R. 99-6 (Gouge Dep. at 40) (Page ID #1881).  However, Conley's failure to follow best medical practices is not necessarily evidence of deliberate indifference if she did not *know* that Jerry's stomach pain was caused by a serious ailment.  Furthermore, even if Conley should have known that Jerry's abdominal "guarding" was indicative of a serious medical condition, she was not deliberately indifferent because she inferred that he was clenching his muscles on purpose as he attempted to sit up and get off the table.  Indeed, Conley did not have the training to understand the significance of the symptoms she observed during her abdominal assessment.  R. 95-5 (Tennessen Dep. at 167–68) (Page ID #1096).  Therefore, Conley did not display deliberate indifference to a known serious medical need during her first interaction with Jerry, at the time he complained of stomach pain.

Nor was Conley deliberately indifferent to Jerry's medical needs later that evening at the second critical point, after he had begun exhibiting bizarre behaviors indicative of mental-health problems.  Conley promptly responded to every call made by correctional staff regarding Jerry's medical complaints (*i.e.* that he vomited, that he ate leftover food from the floor, and that he drank from the toilet).  *Cf. Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 550–51 (6th Cir. 2009) (finding deliberate indifference when a nurse refused to see a patient experiencing severe symptoms until her regularly scheduled medication run several hours later).  This last event is perhaps the most concerning:  it seems obvious to us that anybody who has started drinking from a toilet is suffering from some kind of serious medical ailment.  Indeed, Conley acknowledged that, after the inmates told her that he had been drinking from the toilet, she became concerned that there was a "significant change in [Jerry's] mental status."  R. 95-3 (Conley Dep. at 54) (Page ID #967).  However, we cannot conclude that Conley exhibited deliberate indifference to Jerry's medical needs because she responded to her concerns by moving Jerry to an observation cell where he could be closely monitored by correctional staff.

Perhaps Conley could have and should have done more, including notifying the on-call physician. But she clearly took appropriate steps to protect Jerry. She isolated him from the other inmates in a room where he could not be a danger to himself or others and positioned him in a cell where he would be under near-constant supervision. Although she cannot say for certain that she personally checked on him in the remaining four hours of her shift, she did not deliberately ignore Jerry's needs by relying on the COs to monitor his health and behavior at regular intervals.

Furthermore, Conley was not aware that Jerry's stomach continued to trouble him. Conley did not provide constitutionally deficient treatment by failing to address pain of which she was not aware. "Generally, courts find deliberate indifference where there is evidence tending to establish that the physician is present while the inmate is in distress, *that distress is communicated to the physician*, and the physician purposefully ignores the distress knowing that an adverse outcome is likely to occur." *Jones*, 625 F.3d at 945 (emphasis added). After Jerry's first encounter with Conley, when she provided medication to treat gas and diarrhea, Jerry did not consistently communicate to Conley that he continued to experience cramping and pain. When she asked him how he was feeling at several points during the evening, he either denied that he was in pain or refused to answer. R. 95-3 (Conley Dep. at 48, 68) (Page ID #961, 981). Jerry mentioned that his stomach was cramping only at one other point that night—when Conley checked on him after he was observed eating off of the floor. *Id.* at 51–52 (Page ID #964–65). This complaint was only a few hours after Jerry had taken medication to alleviate his symptoms, and Conley could easily have concluded that the medication simply needed more time to take effect. In any event, Jerry's denial of pain when Conley checked on him at several points throughout the evening did not alert her that the treatment she had already provided was inefficacious to treat the minor ailment from which she had concluded that he suffered.

Finally, Conley did not display deliberate indifference when she encountered Jerry to perform a CIWA during her third shift. Rouster argues that a reasonable jury could conclude that Conley knew that Jerry suffered from a serious medical need at this point because his condition was obvious. Victor Gomez, a CO who observed Jerry at the same time as Conley on the evening of May 10, testified that Jerry looked "pale" and "sick," and that he could tell by the

way that Jerry was looking and acting that "it was pretty obvious that [he] wasn't getting better but getting worse." R. 99-18 (Gomez Dep. at 99–100, 118) (Page ID #1970–72).[4] Gomez also testified that it was "[s]ometimes" clear that Jerry was in pain, and that he complained that "his stomach was hurting, [and that] he wanted water." *Id.* at 122–23 (Page ID #1973–74). Gomez did not share his concerns with Conley or any other medical professional. *Id.* at 118 (Page ID #1972). Because a lay person without medical training was able to perceive Jerry's serious need, however, Rouster argues that the risk must have been obvious to trained medical staff. *See Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008) (concluding that correctional officers were deliberately indifferent to a prisoner's medical needs because the seriousness of the medical condition was obvious to a fellow inmate who shared her concerns and because the officers made comments demonstrating that they were aware of an ongoing medical problem). Gomez's testimony does support Rouster's argument that it was obvious as of the late evening of May 10 that Jerry was ill. In addition, Conley acknowledged that Jerry again complained of stomach cramping when she conducted the CIWA. R. 95-3 (Conley Dep. at 64) (Page ID #977). However, Jerry's weakness at that time would not necessarily have indicated a serious medical condition.

At the point when Gomez claims that Jerry was visibly ill, Conley was aware that Jerry had been assessed for alcohol withdrawal. Jerry was already being treated in accordance with withdrawal protocols, and indeed Dr. Natole was scheduled to see him within the next twelve hours during his regular visit to Saginaw. R. 97-12 (Natole Dep. at 67–68) (Page ID #1742) (explaining that Dr. Natole would ordinarily see a patient he had received a call about on his next scheduled visit, which coincided with the day that Jerry died). Jerry's visible illness and his complaints of stomach cramping were consistent with the symptoms experienced by an individual going through alcohol withdrawal. *See* R. 95-5 (Tennessen Dep. at 107) (Page ID #1081); R. 97-12 (Natole Dep. at 40) (Page ID #1735). Even Gomez's conclusion that Jerry was clearly getting worse was consistent with the course of withdrawal: Marrs's experience was that

---

[4]Conley described Jerry as being "very strong at that time," and recalled that "[h]e was pushing on the door . . . [and] trying to get out." *Id.* at 65 (Page ID #978). Rouster disputes Conley's testimony by pointing to Gomez's claim that Jerry was weak and could not "put up much physical resistance." R. 99-18 (Gomez Dep. at 118) (Page ID #1972). We must interpret all disputed facts in Rouster's favor, and therefore we assume that Jerry was visibly weak and ill at this point in the evening.

the "[t]hird day is usually the worst" for patients experiencing alcohol withdrawal.  R. 95-4 (Marrs Dep. at 101) (Page ID #1013).  If Jerry had consumed alcohol for the last time on May 7 before he was arrested, it would not be surprising that his symptoms of withdrawal would be particularly severe on the morning of May 10, three days later.

Although it was obvious to a layperson that Jerry suffered from some kind of serious illness, Conley was not subjectively aware that Jerry was suffering from a more serious condition than the alcohol withdrawal with which he had been diagnosed.  *See Farmer*, 511 U.S. at 844 (concluding that prison officials may show that they were unaware of a risk, even an obvious one, by proving that they were unaware of the facts indicating significant danger or that they believed the risk posed by known facts was insignificant).  Therefore, Rouster has not presented sufficient evidence from which a reasonable jury could conclude that Conley was deliberately indifferent to Jerry's medical needs.

**B.  Debra Marrs**

Rouster cannot prove that Marrs was subjectively aware of Jerry's serious medical needs and was deliberately indifferent to his welfare.  Like Conley, Marrs had limited information about Jerry's symptoms and medical history.  When Marrs came on duty for her shift, Conley informed her that Jerry had been placed in an observation cell because he had exhibited bizarre behaviors, such as eating from the floor and drinking from the toilet.  R. 95-4 (Marrs Dep. at 74) (Page ID #1007).  Marrs received one more critical piece of information during her shift that changed the course of Jerry's treatment for the remaining hours of his life:  a CO told her that Jerry was known as a heavy drinker.  *Id.* at 92–93 (Page ID #1011).  Based on this information, Marrs conducted a CIWA to assess Jerry for alcohol-withdrawal symptoms.  Marrs concluded that Jerry's various complaints and ailments could be explained by alcohol withdrawal and she began to treat him accordingly.  As explained above, we do not ordinarily second-guess a diagnosis made by a medical provider in a prison setting.  *Jones*, 625 F.3d at 944.

To be sure, medical providers may "not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist."  *Farmer*, 511 U.S. at 843 n.8.  Thus, if Jerry's symptoms had been clearly inconsistent with alcohol withdrawal, Marrs might

have been deliberately indifferent by failing to confirm that his symptoms were not indicative of a different and more serious condition. Indeed, there is some evidence that not all of Jerry's symptoms could be explained by withdrawal: the behavioral anomalies he exhibited were not the kinds of mental disturbances that were typical of withdrawal patients. R. 95-5 (Tennessen Dep. at 139) (Page ID #1089). However, the majority of Jerry's symptoms were entirely consistent with those experienced by patients suffering from alcohol withdrawal. *See Jones*, 625 F.3d at 945 (concluding that a doctor had not shown deliberate indifference by misdiagnosing a prisoner's medical condition when the diagnosis accounted for some, but not all, of the prisoner's symptoms). His abdominal pain,[5] vomiting, agitated behavior, and physical tremors were all symptoms associated with withdrawal. Therefore, given that Jerry's intake form indicated that he was intoxicated when he was admitted to Saginaw, R. 100-4 (Intake Screening Form) (Page ID #2029), Marrs's conclusion that Jerry suffered from alcohol withdrawal was entirely reasonable. Rouster has presented no evidence that Marrs considered an alternative, more serious diagnosis but refused to verify that Jerry's symptoms were consistent with such a condition. Rather, she diagnosed Jerry as suffering from alcohol withdrawal and took the appropriate steps to provide treatment, including calling a physician and placing Jerry on withdrawal protocols. We cannot conclude under these facts that Marrs was subjectively aware that Jerry suffered from a serious medical condition and chose to ignore his need for treatment.

## C. Stella Menchaca

Finally, Rouster has not provided evidence to show that Menchaca knew that Jerry had a serious medical need which she deliberately ignored. When Menchaca began her shift on the evening of May 10, Marrs informed her that Dr. Natole had placed Jerry on withdrawal

---

[5]It is not clear whether Marrs was even aware that Jerry had complained of stomach cramping at any point. Marrs does not recall whether Conley informed her during shift change that Jerry had been assessed for stomach cramping. R. 95-4 (Marrs Dep. at 76) (Page ID #1007). However, Conley testified that she did relay information regarding Jerry's abdominal complaints. R. 95-3 (Conley Dep. at 58) (Page ID #971). Interpreting all facts in Rouster's favor, we may infer that Marrs knew that Jerry had been experiencing abdominal discomfort at 8:00 the previous evening. But Jerry did not complain of stomach pain or cramping to Marrs during any of her interactions with him. R. 95-4 (Marrs Dep. at 114, 158–61) (Page ID #1017, 1028). As we noted above, a medical professional is deliberately indifferent when she ignores complaints of pain that are communicated to her. *Jones*, 625 F.3d at 945. However, Jerry never communicated to Marrs that he continued to suffer abdominal pain, and therefore we cannot conclude that she was subjectively aware that he continued to experience pain and needed treatment.

protocols. Conley also told her about Jerry's medical issues during her first shift, including his abdominal complaints and his bizarre behavioral episodes. In accordance with withdrawal protocols, when she delivered Jerry's medication shortly after her shift began, Menchaca conducted a CIWA to evaluate Jerry for withdrawal symptoms. She noted that his behavior was agitated, that he appeared to be confused, and that he was experiencing physical tremors. R. 97-13 (Menchaca Dep. at 109) (Page ID #1776). These symptoms were consistent with those experienced by individuals going through alcohol withdrawal. R. 95-5 (Tennessen Dep. at 107) (Page ID #1081) (hallucinations, abdominal pain, and vomiting); R. 99-6 (Gouge Dep. at 34) (Page ID #1879) (anxiety and tremors). Furthermore, Menchaca was unaware that Jerry continued to suffer stomach pain: He did not complain of cramping to her at any time, and she observed him engaging in behaviors, such as reaching up high or bending over, that indicated he was not suffering from an "acute abdomen." R. 97-13 (Menchaca Dep. at 110–12, 114, 119) (Page ID #1777–79). Like Marrs, Menchaca believed that Jerry was suffering from alcohol withdrawal, and she treated him appropriately for the medical needs that she believed he had.

The medical care provided to Jerry while he was held in Saginaw was questionable. Medical staff providing proper care would have, in an abundance of caution, caused Jerry to see a physician when he began experiencing severe abdominal pain; at the least, they would have continued to assess his abdomen for rigidity or other signs of "acute abdomen" while he was held in observation. However, none of the medical personnel who interacted with Jerry displayed deliberate indifference. They were each ignorant of the single critical fact that might have caused them to interpret his symptoms in a different light: At no point in time did Jerry tell any member of the medical staff about his previous treatment for a perforated duodenal ulcer. R. 95-5 (Tennessen Dep. at 14, 136) (Page ID #1058, 1088); R. 97-14 (Goldenson Dep. at 85–91) (Page ID #1812–13). Had they received full information regarding Jerry's medical history, we could easily conclude that Conley, Marrs, and Menchaca were deliberately indifferent to Jerry's needs. *See Johnson v. Karnes*, 398 F.3d 868, 875–76 (6th Cir. 2005). However, "the standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done." *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc). We must judge their actions based on the information that was available to them at the time.

Because the nursing staff did not know that Jerry suffered from a serious medical ailment, and they instead interpreted his symptoms as indicating a different condition, for which they provided appropriate treatment, they were not deliberately indifferent to his medical needs. No record evidence indicates that any member of the nursing staff ever suspected that Jerry was suffering from a more serious condition than alcohol withdrawal. *Cf. Perez v. Oakland Cnty.*, 466 F.3d 416, 425 (6th Cir. 2006) (concluding that a genuine question of material fact existed regarding a prison doctor's subjective awareness of serious medical risk to a prisoner who committed suicide when the doctor had several times previously placed a prisoner on elevated suicide watch). Because Jerry was not deprived of any constitutional rights, Rouster cannot successfully assert a § 1983 claim. Accordingly, it was appropriate for the district court to grant summary judgment in favor of Conley, Menchaca, and Marrs on the claim that they violated Jerry's constitutional rights by depriving him of treatment for his serious medical needs.

## IV. FAILURE TO TRAIN

Rouster also asserts a § 1983 claim against Secure Care for failing to staff Saginaw with "competent medical personnel" and failing adequately to train and supervise medical staff in monitoring prisoners for serious medical conditions. R. 1 (Compl. ¶¶ 53–54) (Page ID #11–12). Private corporations that "perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting under color of state law." *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (internal quotation marks omitted). However, private corporations cannot be held liable on the basis of respondeat superior or vicarious liability. *Id.* at 818. Accordingly, a plaintiff must prove both "that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (citation omitted); *see also Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012); *Broyles v. Correctional Med. Servs., Inc.*, No. 08-1638, 2009 WL 3154241, at *2 (6th Cir. Jan. 23, 2009). As discussed above, Rouster is unable to prove that Jerry's constitutional rights were violated. Therefore, we need not consider whether Secure Care's staffing or training policies might have caused such a violation. The district court appropriately granted summary judgment in favor of Secure Care on Rouster's claim that the private corporation failed adequately to train and supervise medical staff in the prison.

## V.  STATE MALPRACTICE AND NEGLIGENCE CLAIMS

Rouster's remaining claims arise under state law and implicate complex questions regarding the standard of care for nursing professionals in Michigan.  We have held that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (citation omitted); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").  This rule accords with principles of federalism:  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. Because we have affirmed the grant of summary judgment in favor of the defendants on the federal-law claims, we conclude that the district court appropriately declined to exercise supplemental jurisdiction over the remaining state-law claims.  Rouster may pursue his malpractice and negligence claims in the appropriate state court.

## VI.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.