NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name:  19a0473n.06

Case No. 18-2228

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>ANTONIO VINSON, Personal Representative of the Estate of Michael Vinson,</td><td>)<br>)<br>)</td><td rowspan="10"></td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)<br>)</td></tr>
<tr><td>v.</td><td>)<br>)</td></tr>
<tr><td>MICHIGAN DEPARTMENT OF CORRECTIONS, et al.</td><td>)<br>)<br>)</td></tr>
<tr><td>    Defendants,</td><td>)<br>)</td></tr>
<tr><td>CORIZON CORPORATION; RICHARD MILES, M.D.; KAREN RHODES, D.O.; EDDIE JENKINS, M.D.,</td><td>)<br>)<br>)<br>)</td></tr>
<tr><td>    Defendants-Appellees.</td><td>)</td></tr>
</table>

> **FILED**
> Sep 10, 2019
> DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE:  COOK, NALBANDIAN, and MURPHY, Circuit Judges.

COOK, Circuit Judge.  In this 42 U.S.C. § 1983 action, Antonio Vinson, representing Michael Vinson's estate, alleges that three prison doctors and their employer, Corizon Health, Inc., ignored his brother's serious medical needs before his death, their deliberate indifference violating the Eighth Amendment.  The district court entered summary judgment for the doctors, holding that the treatment at issue amounted, at most, to medical malpractice rather than the deliberate indifference needed to establish a constitutional claim.  We AFFIRM.

**I.**

Corizon delivered prisoner medical services at Michigan Department of Corrections's Cotton facility, which housed Michael Vinson from October 2008 until a few days before his death on May 25, 2012. Drs. Richard Miles, Karen Rhodes, and Eddie Jenkins cared for Vinson at Cotton, beginning with an October 2011 complaint of back pain.

Dr. Miles assessed Vinson first. Unable to determine what might be aggravating Vinson's back during an October 25, 2011 physical examination, Dr. Miles scheduled a follow-up to reassess Vinson with Dr. Rhodes. Three days later, Drs. Rhodes and Miles examined Vinson for back pain and constipation, prescribed medication, and ordered a two-month follow-up.

In the interim, Vinson saw Corizon nurses at least four times for recurring abdominal pain and repeated vomiting. On December 5, 2011, a nurse referred Vinson's complaints of lower left abdominal pain to Dr. Jenkins. Dr. Jenkins noted that Vinson's pain had worsened over the month, but that he did not hear "murmurs, gallops, or rubs," or any other signs suggesting abdominal abnormalities. Vinson told Dr. Jenkins that his prescribed medications failed to relieve his chronic pain, so Dr. Jenkins ordered an x-ray, which showed Vinson's abdomen in normal condition.

Seven times over the next four weeks, Vinson reported abdominal and back pain, constipation, and frequent vomiting to Corizon nurses and doctors. Each examination found no abdominal mass and usual bowel sounds without abnormal "bruits" or murmurs, the negative indicators for abdominal health. Lab tests revealed no signs of internal bleeding or infection, and Vinson told Dr. Miles that he experienced occasional relief only after bowel movements. Drs. Miles and Rhodes prescribed medication and a restrictive diet, ordering follow-ups to monitor his pain and symptoms. But by December 30, 2011, suffering continued sharp back pain, intermittent

abdominal pain, and daily vomiting—and the origin of his pain still unclear—defendant doctors sent Vinson to an emergency room for further evaluation.[1]

At the hospital, Vinson reported vomiting on forty-five consecutive days, in addition to left lower quadrant pain. Hospital personnel concluded that Vinson's symptoms reflected "[c]hronic abdominal pain with [a] history of constipation" and "[c]hronic back pain," recommending no further testing.

Post-hospitalization, Vinson's reports of nausea, lower back pain, and abdominal pain continued. Corizon nurses examined Vinson at least seven times before January 31, 2012, when Dr. Miles examined Vinson in his cell for abdominal pain radiating to his back. Dr. Miles recorded no abnormal abdominal sounds, but no abdominal tenderness, although the exam evidenced tenderness in the bank/spine area when palpated with a paper clip. Vinson's "[b]owel sounds [were] present, [but] no bruits." Dr. Miles also noted that Vinson refused his treatment recommendations. When deposed, Dr. Miles stated that he considered a gastroenterologist referral unwarranted at the time because "the subjective complaints [did not] match[] the objective findings[.]"

Vinson eventually grew frustrated with Corizon medical staff. During a February 15, 2012 meeting, Vinson told a prison psychiatrist that he'd submitted a grievance over "what he perceive[d] to be a lack of care." The psychiatrist expressed doubt when Vinson claimed that he'd lost twenty-five pounds, noting that "his weight was 185 [lbs] on 10/30/11 and was stable around that weight for some time and is now 169 when taken on 2/8/12."

---

[1] Dr. Miles and Dr. Jenkins each had a hand in referring Vinson to the emergency room. Dr. Jenkins mentioned the referral in his notes the day before the emergency room visit, and in his deposition Dr. Miles took credit for the referral. Magistrate Judge Davis's Report and Recommendation supports both doctors' involvement.

Vinson requested no further medical care until March 15, 2012, when a nurse responded to his renewed complaints of back and abdominal pain. But Vinson refused treatment on the nurse's arrival, "stating that they won't do anything for me in healthcare." He changed course within the week, however, and returned to the clinic for further examination on March 23rd. Again, a nurse practitioner noted that Vinson's bowel sounds were present without bruits. Even so, the nurse found that his fifteen-pound weight-loss over four months warranted testing for infection, internal bleeding, or other abnormalities. A dietician later concluded that Vinson did not present "clinically significant weight loss, and his BMI indicates he is on the border between healthy/overweight range."

Vinson saw Dr. Miles again on April 25, 2012. Another physical examination revealed bowel sounds without any abnormal bruit sounds. Dr. Miles ordered a blood test, a stool sample, and a follow-up appointment to occur in one month's time. But short of the one-month follow-up, Vinson sought a transfer to another MDOC facility; another inmate had threatened his life. Segregated and awaiting transfer, Vinson sent nurses a request for treatment, saying his pain had grown so severe that he could "barely walk."

By May 23rd, Cotton nurses cleared Vinson for transfer. Upon Vinson's arrival at the new facility, a nurse immediately referred him to a physician for examination. Her urgent request detailed a forty-pound weight-loss and five days without a bowel movement, even though Vinson's bowel sounds remained audible.

The next morning, before a physician at the new facility could assess him, nurses found Vinson unresponsive. He died from a ruptured abdominal aortic aneurysm (AAA). According to Corizon's experts, Vinson's particular type of AAA would not have generated any audible indicators, and its location made it inaccessible to physical examination.

On behalf of Michael Vinson's estate, Antonio Vinson sued Corizon, its doctors, and its nurses for deliberate indifference to his brother's serious medical needs. The complaint alleged that the doctors conspired to ignore Vinson's complaints, and that Corizon maintained an unconstitutional policy of delaying prisoner medical care.

Corizon and the doctors moved for summary judgment. The district court granted their motion on Vinson's deliberate indifference and civil conspiracy claims, and on the *Monell* claim against Corizon. This appeal followed.

## II.

This court reviews the district court's grant of summary judgment de novo, drawing all reasonable factual inferences in favor of the nonmovant. *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 476 (6th Cir. 2010). Summary judgment is appropriate where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Vinson alleges that Corizon and its employees showed deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail, he must satisfy both the objective and subjective components of this Eighth Amendment claim. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The district court concluded that Vinson suffered "a sufficiently serious medical need," satisfying the objective component. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). But the court granted summary judgment to the doctors because Vinson failed to satisfy the subjective component. We begin our analysis there.

We agree that Vinson failed to present evidence raising a genuine issue of material fact on the subjective component of his claim, which assesses whether Drs. Miles, Rhodes, and Jenkins bore "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (citation omitted); *see also Mitchell v. Hininger*, 553 F.

App'x 602, 604 (6th Cir. 2014). Mere negligence in identifying or treating a medical need does not rise to the level of an Eighth Amendment violation. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Vinson instead must show that his prison doctors perceived a risk of harm, disregarded that risk, and failed to take reasonable measures to abate the risk. *Id.* That means an inference of deliberate indifference is unwarranted so long as Drs. Miles, Rhodes, and Jenkins "order[ed] treatment consistent with the symptoms presented and then continue[d] to monitor [Vinson's] condition." *Rhinehart v. Scutt*, 894 F.3d 721, 743 (6th Cir. 2018) (internal quotation marks omitted).

Vinson charges Drs. Miles, Rhodes, and Jenkins with deliberate indifference because they performed only "perfunctory physical examinations on each of the 9 times they treated Michael Vinson," despite his ongoing complaints of abdominal pain, daily vomiting, and concerning weight-loss. The subjective component requires an individual analysis as to each defendant, *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005), and turns on whether a jury could conclude that each doctor consciously disregarded Vinson's serious medical needs and thereby caused him harm, *Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013).

Vinson may rely on circumstantial evidence to show that each doctor knew of, but disregarded, his AAA: a jury may "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. Where a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, a jury may find that the official had knowledge. *Id*. at 842-43. In any case, Vinson must present enough evidence from which a jury could conclude that each doctor "so recklessly ignored the risk that he was deliberately indifferent to it." *Cairelli v. Vakilian*, 80 F.

App'x 979, 983 (6th Cir. 2003); *see also Rouster v. Cty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014).

## A. Dr. Miles

Dr. Miles examined Vinson nine times between October 2011 and April 2012, their last visit roughly a month before Vinson's May 25th death. Vinson alleges that Dr. Miles provided grossly inadequate treatment over those visits by repeatedly conducting only cursory physical examinations. Dr. Miles referred Vinson to an emergency room on December 30, 2011, after deciding his symptoms could not be addressed at Cotton and warranted further evaluation. On Vinson's telling, Dr. Miles subjectively perceived a risk of harm, but disregarded it by "refus[ing] to consider and implement effective alternatives" like a gastroenterologist or emergency room referral. Vinson also charges Dr. Miles with ordering lab tests without bothering to review the results and refusing his MRI or CAT scan requests, despite worsening vomiting and weight-loss. In response, Dr. Miles argues that Vinson merely disagrees with his medical judgment and the course-of-treatment provided.

Like the district court, we discern no question of material fact regarding whether Dr. Miles knew but consciously disregarded the risk of Vinson suffering an AAA. Though he never resolved Vinson's symptoms, the record reveals Dr. Miles's extensive efforts to identify the cause of Vinson's pain and to provide relief. Vinson's claim that Miles abandoned that effort by failing to scrutinize certain test results lacks support in the record. What's more, Vinson submitted no evidence connecting those allegedly unreviewed blood and stool tests to the undisputed cause of death, an AAA.

Though Vinson makes much of Dr. Miles's failure to return him to the emergency room, as the hospital's discharge instructions recommended if symptoms worsened, he was not under Dr.

Miles's care in May 2012, when his weight-loss and vomiting markedly worsened. In fact, Dr. Miles and Corizon nurses continued to assess and treat Vinson, with several dietary and medication adjustments. Vinson disagrees with Dr. Miles's course of treatment, but without evidence of "grossly inadequate care" or that Dr. Miles "deci[ded] to take an easier but less efficacious course of treatment," *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008) (internal quotation marks omitted), that disagreement won't suffice to establish the subjective component here.[2]

### B. Dr. Rhodes

Vinson lodges similar accusations against Dr. Rhodes. He generally argues that his medical records establish at least three visits by Dr. Rhodes that alerted her to his symptoms, and yet he worsened while under her care. As with Dr. Miles, Vinson faults Dr. Rhodes for failing to refer him to a gastroenterologist, order an MRI, or return him to the emergency room in the five months after his first hospital stay. His estate argues that he died because of her failure and refusal to provide constitutionally adequate care.

But on this record, Vinson's claim that Dr. Rhodes consciously disregarded his serious medical needs fails. Dr. Miles consulted with Dr. Rhodes to seek the benefit of her background in osteopathic medicine for diagnosing Vinson. The two doctors assessed Vinson for back pain and constipation on October 28, 2011, which then resulted in ordering Vinson new pain medication and a two-month follow-up appointment. And when Vinson returned to the clinic in December with renewed complaints of left-sided abdominal pain, constipation, and nausea, Dr. Rhodes

---

[2] As for Vinson's motion to supplement the appellant record with evidence that Corizon fired Miles for various administrative shortcomings and providing substandard care, we determine that even had this court hurdled the procedural roadblocks to supplementing the record on appeal, crediting that evidence could not have affected the granting of summary judgment, given Vinson's burden to show more than negligence.

further adjusted his course of treatment; this time, Toradol injections to alleviate the pain and a restrictive diet until Vinson's nausea subsided. Their final consulting visit on January 26, 2012, went much the same.

Importantly, Dr. Rhodes last saw Vinson four months before he died—and well before his dramatic weight loss. With this record of ongoing treatment, Vinson's insistence that Dr. Rhodes should have ordered Vinson's preferred treatment course, an MRI, amounts to a disagreement with Dr. Rhodes's medical judgment, not constitutionally inadequate care. *See Estelle*, 429 U.S. at 107. The district court properly granted summary judgment to Dr. Rhodes.

### C. Dr. Jenkins

Dr. Jenkins treated Vinson for back and abdominal pain at least four times. On each visit, Vinson argues, Dr. Jenkins went through the motions, performing only a cursory physical examination. Vinson insists that Dr. Jenkins should have done more by way of diagnosis and treatment.

The record evidence shows, however, that Dr. Jenkins too pursued various treatments for Vinson. He ordered an x-ray, additional Toradol injections for pain, and sent Vinson to the emergency room for further evaluation. Here again, Vinson's claim reveals a disagreement with his doctor's medical judgment, not inadequate medical treatment amounting to a constitutional violation. Because he raises at most a claim of medical malpractice, the district court properly granted summary judgment to Dr. Jenkins. *See Estelle*, 429 U.S. at 107.

Because this record reveals that Vinson cannot meet the subjective component, we need not go on to analyze the objective component. *Blaine v. Louisville Metro. Gov't*, 768 F. App'x 515, 524 (6th Cir. 2019) ("[A]n inmate alleging cruel and unusual punishment must demonstrate both components to prevail.").

### III.

In addition to his claims against Drs. Miles, Rhodes, and Jenkins, Vinson argues that Corizon itself violated his Eighth Amendment rights by adopting a policy or custom of understaffing physicians. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005). But before we assess Corizon's policies for potential liability, Vinson "must demonstrate a constitutional violation at the hands of a[] [Corizon] agent or employee." *Fox v. DeSoto*, 489 F.3d 227, 238 (6th Cir. 2007); *see also Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005). As discussed, Vinson failed to establish deliberate indifference on the part of any individual Corizon doctor, so no constitutional injury exists to support his claim against Corizon. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, [] municipal defendants cannot be held liable under § 1983."). Vinson's *Monell* claim necessarily fails.

### IV.

We affirm the district court's granting summary judgment to Corizon and Drs. Miles, Rhodes, and Jenkins on Vinson's deliberate indifference and § 1983 claims.