NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0287n.06

Case No. 18-2335

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| NATHAN K. LUMBARD, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| MARK LILLYWHITE, Undersheriff; TIM | ) | MICHIGAN |
| SCHULER, Captain; PATTY KANE, N.P., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

**FILED**
May 21, 2020
DEBORAH S. HUNT, Clerk

**BEFORE: BOGGS, GRIFFIN, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge.** While being held in a Michigan county jail, Nathan Lumbard alleges that he complained of vision and motor issues, only to have the jail staff punish him for making those complaints and unduly delay any treatment. Lumbard was later diagnosed with multiple sclerosis, a chronic neurological degenerative disease. He then filed a pro se § 1983 complaint, claiming deliberate indifference and retaliation by officials at the jail. The district court determined that Lumbard's allegations were sufficient to survive motions for judgment on the pleadings and summary judgment as to some of those officials, but that Lumbard's claims against other officials otherwise fell short. Seeing no error in the district-court proceedings, we **AFFIRM**.

## I.     BACKGROUND

Lumbard alleges that while he was serving a two-year federal sentence for aggravated identity theft, he began to experience issues with his eyesight.  Lumbard was referred to a specialist but was transferred to a county jail in Indiana to face state charges before he could be seen.  While incarcerated in Indiana, Lumbard claims to have experienced similar vision issues, but chose not to report them.

A month later, Lumbard was transferred to a county jail in St. Joseph, Michigan to face additional charges there.  Lumbard alleges that he continued to experience vision issues.  But the parties diverge on what occurred next.  Nurse Practitioner Patty Kane claims that upon Lumbard's arrival at the St. Joseph jail, he reported seasonal allergies and anxiety, but no disabilities or special needs.  Two weeks later, Kane claims, Lumbard reported anxiety and a toe infection but denied having any family history of illness.  Kane noted that Lumbard wore glasses but appeared to be in normal health.  Lumbard, however, claims that he told Kane he had been experiencing abrupt deterioration in his eyesight.  Lumbard says he then gave a detailed explanation of his condition, which he says Kane did not document.

Roughly five months later, Lumbard was permitted to visit an ophthalmologist.  Again, the parties diverge as to what led up to that visit.  According to Kane, when Lumbard informed her of his vision problems by an undated letter, she scheduled an appointment the next day.  But Lumbard claims that from the time he arrived at the St. Joseph facility, he made daily requests to see a doctor, and that Kane scheduled the ophthalmologist appointment only after repeated calls by Lumbard's mother and counsel.  Both parties agree, however, that the ophthalmologist recommended that Lumbard see another doctor.

Sometime later, Lumbard complained of experiencing a "weird gait." Upon examination, Kane noted that Lumbard's "neuro" was normal. Around this time Lumbard informed Kane that his sister had multiple sclerosis, a chronic nerve disease. And once again, the parties' versions of the story diverge. Kane claims to have moved Lumbard to a holding cell to better observe his motor function. Lumbard frames the act as a vengeful one, describing the "holding cell' as the "drunk tank" of the facility, a crowded cell where many inmates end up sleeping on the floor. Lumbard alleges that Kane told him, "since you want to play sick and have your Mother call up here, you can go upfront. I'm not going to have a worried mother on my hands." Once in the holding cell, Lumbard claims to have initiated a five-day hunger strike, to gain access to a doctor.

Lumbard filed two grievances in January to complain about being placed in the holding cell, and the delay in seeing a doctor. Captain Tim Schuler responded to Lumbard's first grievance. He explained in writing that he and Undersheriff Mark Lillywhite made the decision to place Lumbard in the holding cell "for officers to keep an eye on [him] as [he] ha[d] some medical needs and safety." In his response to the second grievance, Schuler wrote to Lumbard informing him that per a conversation between Schuler and Kane weeks earlier, Kane was trying to schedule a specialist appointment, which does "not happen overnight."

Eventually, Lumbard was permitted to see doctors. Lumbard was first observed by a jail doctor, who concluded that Lumbard was acting symptomatically only when he thought others were watching. Lumbard then met with a neurologist, who concluded that Lumbard's movements appeared to be normal and that his gait issues may have been embellished. But after learning about Lumbard's family history of multiple sclerosis, the neurologist recommended that Lumbard receive a brain MRI without contrast.

The MRI revealed certain abnormalities in Lumbard's brain consistent with multiple sclerosis. Medical staff at the hospital recommended a second MRI, this time with contrast. Before that procedure could take place, however, Lumbard was transferred to federal prison. In conjunction with the transfer, Kane explained the MRI results to Lumbard and informed him that she would send his medical records to the federal prison's medical unit. Months later while in federal prison, Lumbard was diagnosed with multiple sclerosis.

Believing that his medical treatment fell below constitutional guarantees, Lumbard filed a pro se 42 U.S.C. § 1983 action against various law-enforcement officials and agencies, in addition to medical providers. *Lumbard v. St. Joseph Cty. Sheriff Dep't*, No. 1:15-CV-1013, 2018 WL 4927110 (W.D. Mich. Oct. 11, 2018). Many defendants successfully moved to dismiss the case on the pleadings or otherwise prevailed at summary judgment through theories of sovereign immunity, insufficient involvement with Lumbard's alleged constitutional violations, or Lumbard's failure to allege institutional policies as required by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). With respect to Kane, however, the district court found a genuine factual dispute over whether she was deliberately indifferent to Lumbard's vision issues and denied her motion for summary judgment. *Lumbard*, 2018 WL 4927110, at *2. The district court also denied Kane, Schuler, and Lillywhite's motion for judgment on the pleadings on Lumbard's retaliation claim, concluding that Lumbard had alleged a viable claim based upon the officials' decision to place Lumbard in a holding cell allegedly as punishment for earlier complaints. *Id*. Kane, Schuler, and Lillywhite timely appealed.

## II.    ANALYSIS

*Legal Standard.* We review a denial of qualified immunity de novo. *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015). In reviewing whether Kane's motion for summary judgment was

properly denied, we "view all evidence, and draw all reasonable inferences, in the light most favorable" to Lumbard. *Id*. at 410 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Likewise, as to the denial of Defendants' motion for judgment on the pleadings, we "construe the complaint in the light most favorable to the plaintiff" and "accept all of the complaint's factual allegations as true." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 608 (6th Cir. 2014) (internal citations and quotations omitted).

Perhaps through no fault of any party or the district court, the record is a bit jumbled as to the precise framing of Defendants' arguments. Acting pro se, Lumbard's allegations in his complaint understandably are not as clear as they might otherwise be. In their responsive motion for summary judgment or alternatively for judgment on the pleadings, which was initially heard by the magistrate judge, Defendants made mention of their qualified immunity from suit, but otherwise only modestly developed any arguments in a qualified-immunity framework, as opposed to a more broad-based attack on Lumbard's complaint. The magistrate judge's ensuing report and recommendation agreed with Defendants, but it too did not employ a detailed legal analysis of qualified immunity. Nor does the district court's order, which disagreed with the report and recommendation in certain respects. Defendants' brief on appeal then returns to a more customary qualified-immunity framework in articulating its arguments.

Against this somewhat fragmented backdrop, we will assess this appeal as one challenging the denial of Defendants' assertion of qualified immunity to Lumbard's § 1983 claims. To overcome that assertion, Lumbard must establish that the facts, viewed in the light most favorable to him, "show that a constitutional violation occurred," and that the "violation involved a clearly established constitutional right of which a reasonable person would have known." *Sample v. Bailey*, 409 F.3d 689, 695–96 (6th Cir. 2005) (citation omitted). By and large, the parties seem to

5

agree on the governing legal standards underlying Lumbard's claims. They disagree, however, over the viability of Lumbard's claims when measured against those standards. That is, Defendants largely do not dispute that Lumbard's assertions, if true, would reveal a violation of his clearly established constitutional rights. But they vigorously dispute his version of the facts, and they likewise raise procedural objections.

*Deliberate Indifference*. The Eighth Amendment's prohibition against "cruel and unusual punishment" forbids prison officials from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's serious medical needs. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see* U.S. Const. amend. VIII. A deliberate-indifference claim is cognizable in a suit brought under § 1983. *Blackmore*, 390 F.3d at 895 (citing *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985)).

Deliberate-indifference claims have both an objective and subjective component. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). As an objective matter, a plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm." *Id.* (citing *Farmer*, 511 U.S. at 834). And as a subjective matter, a plaintiff must show that the liable official had a "sufficiently culpable state of mind in denying medical care." *Id.* (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)).

1. Starting with the objective element of a deliberate-indifference claim, one way a plaintiff can establish that the conditions in question posed a substantial risk of serious harm is to demonstrate conditions that reflect "an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Id.* at 898. In defining an "obvious need," we have moved with understandable caution, as an excessively broad

definition would transform deliberate-indifference suits into what they are not, namely, negligence suits. *Farmer*, 511 U.S. at 835 (distinguishing between deliberate indifference and negligence, as the Eighth Amendment prohibits only the former); *see also Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (observing that if the prisoner received some medical attention but disputes its adequacy, the courts are "generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law" (citation omitted)). But our precedent, with some irony, has not always made it entirely obvious how to identify situations in which there is "an obvious need for medical care."

We sometimes read the term to require that the medical need be easily detectable by a layman from visual inspection. *See, e.g.*, *Phillips v. Roane Cty.*, 534 F.3d 531, 540 (6th Cir. 2008) (holding that a medical need was objectively obvious where prisoner had been found unconscious, without breath or pulse, two weeks before his death, and where an inmate testified that the prisoner's "extremely sick" condition was "obvious to normal persons"). But in other cases, we have looked not to what was obviously detectable to the eye but instead to whether a layman, made aware of an individual's actual medical condition, would consider the condition to be obviously medically serious; that is, even if the layman cannot see the medical need, if informed of the true medical situation, the layman would deem the need for medical attention clear. *See, e.g.*, *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446, 451 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). Addressing this division of authority, we have reasoned

7

that the latter line of cases was on stronger ground, because relying on a test that turns on a layman's actual observation threatens to merge what is an objective test into the subjective component of deliberate indifference. *Gunther v. Castineta*, 561 F. App'x 497, 500 (6th Cir. 2014).

Against this backdrop*,* Lumbard's multiple sclerosis certainly qualifies as an "obvious" serious medical need. Notified that someone was suffering from multiple sclerosis, an objective layman would deem the condition serious. Among other things, the condition can cause serious and permanent nerve damage that can lead to permanent disabilities. *See id*.; *see also* Loren A. Rolek, *Multiple Sclerosis: It's Not the Disease You Thought It Was*, 1 Clinical Medicine and Research 57, 58 (2003). To be sure, multiple sclerosis manifests itself differently in different people, sometimes in subtle ways, and at the time Lumbard was seeking medical help, he did not know of his underlying condition. But a plaintiff need not know he is experiencing a serious medical condition for the condition to satisfy the objective component of deliberate indifference. *See, e.g.*, *Rouster*, 749 F.3d at 446, *Gibson v. Moskowitz*, 523 F.3d 657, 662 (6th Cir. 2008) (holding that it was objectively medically serious when a mentally disturbed inmate was treated with medication that impaired his ability to regulate temperature while he was placed into a hot observation room).

2. Having established that Lumbard, as an objective matter, was incarcerated under conditions posing a substantial risk of harm, we must consider whether his symptoms were the kind that, if deliberately ignored, would reveal a "sufficiently culpable state of mind" by the relevant prison official "in denying medical care." *Blackmore*, 390 F.3d at 895 (quoting *Brown*, 207 F.3d at 867). This subjective component requires more than "mere negligence," but does not require that the prison official have knowledge or purpose that her act or omission would harm

Lumbard. *Id*. at 895–96 (quoting *Farmer*, 511 U.S. at 835). Rather, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Lumbard's undiagnosed multiple sclerosis, by itself, would not seem to satisfy the subjective component of deliberate indifference. Lumbard does not allege that any Defendant was aware of facts from which one could fairly infer a multiple-sclerosis diagnosis specifically, let alone that an inference was actually drawn. Because the condition manifests differently in different people, occasionally through subtle symptoms, it can be challenging to diagnose. Rolek, *supra*, at 58 ("[Multiple sclerosis] can be among the most difficult of all diseases to diagnose because of the bewildering number of symptoms it causes and the multiple ways in which they can present."). Only with the benefit of hindsight could one deem Lumbard's then-undiagnosed multiple sclerosis "obvious" and thus requiring treatment. *Rouster*, 749 F.3d at 453 (noting that the deliberate-indifference "standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done . . . We must judge their actions based on the information available to them at the time") (internal quotations and citations omitted).

That said, Lumbard did have two specific complained-of symptoms—a deterioration in eyesight, and a "weird gait." Even if one could not fairly infer that those conditions reflected multiple sclerosis specifically, they are nonetheless reflective of a serious condition in their own right. That is perhaps less so as to Lumbard's alleged "weird gait." One can fairly debate whether his gait was an "obviously severe" symptom, given the many more pedestrian reasons why someone might have a hitch in their step.

But Lumbard's alleged deterioration in eyesight, especially when interpreted to be abrupt, would be a more obvious concern. *See Morris v. Corr. Med. Servs., Inc.*, No. 2:07-CV-10578,

9

2012 WL 5874477, at *3 (E.D. Mich. Nov. 20, 2012) (holding that delaying a cataract extraction for four years created a genuine issue of material fact over whether the removal of the cataract was a "serious medical need"). Lumbard alleged that his deterioration in eyesight was "abrupt," "blurred" his vision, and was accompanied by "double vision" and "headaches." According to Lumbard, he informed Kane about his vision issues upon arriving at the jail and frequently brought the issue to her attention thereafter, yet Kane deliberately failed to document his complaints.

Kane, in fact, largely does not contest the conclusion that Lumbard's claims, if true, reflect a violation of clearly established constitutional law. Instead, she responds that Lumbard did not notify her of his vision issues until he had been at the jail for many weeks, and that a visit with the ophthalmologist was scheduled soon thereafter. Appellant Br. at 43–45. But in this posture, our interlocutory jurisdiction does not extend to instances where defendants "merely quibble with the district court's reading of the factual record." *Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008). Rather, our interlocutory jurisdiction extends to the legal question of whether "the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a . . . violation of clear constitutional law." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) (citation omitted).

True, despite this general practice, we will sometimes engage a district court's determination of a factual dispute when the record shows that determination to be "blatantly and demonstrably false." *Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011). Kane, however, has not met that high bar. She argues that the record, including the medical screening form, medical intake form, and an undated letter, implies that Lumbard did not mention his vision issue to her until he had been at the facility for five months. But none of those documents demonstrate that Lumbard's version of events in his complaint and also in his declaration, which he signed under

the penalty of perjury, *see* 18 U.S.C. § 1621, that he immediately and consistently complained to Kane about his vision issues and that she nonetheless failed to document his complaints, is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Smith v. Stoneburner*, 716 F.3d 926, 930 (6th Cir. 2013) (characterizing parties' conflicting stories as "the epitome of a triable issue of fact, one over which our authority recedes and the jury's takes over") (internal citations omitted). At a trial, of course, Lumbard would still have to convince a jury that his version is correct. And Kane, were she to lose at trial, would have another opportunity for appeal. For today's purposes, however, it is enough to say that we cannot conclude that Lumbard's version is so incorrect that his claim fails against Kane's assertion of qualified immunity.

Nor do we find dispositive Kane's contention that Lumbard's deliberate-indifference claim should be barred because his declaration was submitted in response to declarations filed by other defendants. She cites no case law for this proposition. And while it would be fair to fault Lumbard for making Kane sift through a "645-page exhibit" to unearth Lumbard's allegations, that does not seem to be what happened here. Relevant allegations, in fact, appear on the first page of Lumbard's complaint. Accordingly, Lumbard's deliberate-indifference claim against Kane survives summary judgment against a claim of qualified immunity.

*The Retaliation Claim.* "A prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001). To establish a First Amendment retaliation claim, Lumbard must show 1) that he "engaged in activities protected by the Constitution or statute"; 2) that "defendants took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct"; and 3) "that this adverse action

11

was taken at least in part because of the exercise of the protected conduct." *Id*. at 1037 (citing

*Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).  Not all forms of protest,

however, are protected.  If "a prisoner violates a legitimate prison regulation, he is not engaged in

'protected conduct,' and cannot proceed beyond step one." *Thaddeus-X*, 175 F.3d at 395.

Starting with the first element, Lumbard's alleged complaints about the lack of medical

care, including his apparent enlistment of his mother to complain, are activities protected by the

Constitution.  His complaints invoked his "right[] to free speech," specifically his right "to petition

the state for redress of grievances."  *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996) (citing

*Wolfel v. Bates*, 707 F.2d 932, 933 (6th Cir. 1983)).  There is no allegation that Lumbard, whether

in asking for access to a doctor or relaying his complaints to his mother, unfairly impeded prison

officials in meeting the legitimate needs of the prison.

As to the second element of retaliation—whether Defendants took an adverse action that

would deter a "person of ordinary firmness" from protected activity—we must consider the action

taken against Lumbard in the context of prison operations.  "Prisoners may be required to tolerate

more than public employees, who may be required to tolerate more than average citizens, before

an action taken against them is considered adverse."  *Thaddeus-X*, 175 F.3d at 398.  Viewing

Defendants' actions through this calibrated lens acts to screen out "the most trivial of actions from

constitutional cognizance," and recognizes that "certain threats or deprivations are so de minimis

that they do not rise to the level of being constitutional violations."  *Id*.

Lumbard's allegations, which we must assume to be true in the posture of reviewing a

denied motion for judgment on the pleadings, satisfy this element as well.  *Hayward*, 759 F.3d at

608.  He claims that, in response to his and his mother's grievances, he was placed in the "drunk

tank," a "filthy, chaotic, and overcrowded" space.  Lumbard alleges that, while there, he could not

shower for days at a time. And he alleges that he preemptively struck a co-inhabitant because he felt threatened. In *Thaddeus-X*, we held that when prison officials, in addition to other harassing actions, place an inmate in "the area of the prison used to house mentally disturbed inmates," that "would likely have a strong deterrent effect" on the inmate's protected activities. 175 F.3d at 398–99. While not entirely analogous, Lumbard's alleged experience in the "drunk tank" appears similarly unpleasant and stressful so as to rise above a de minimis deprivation.

That brings us to the final element of a retaliation claim—whether the prison officials' adverse action was caused by Lumbard's protected activities. Lumbard's retaliation claim survives a motion for judgment on the pleadings if he alleges facts that his protected activity was "a motivating factor" behind the adverse action. *Id*. at 399. To that end, Lumbard alleges that Kane told him he was being moved to the holding cell because of his mother's calls. Lumbard adds that Kane, in a conversation with Lumbard's counsel, insinuated that she was going to move Lumbard out of the holding cell, but threatened to reconsider her course of action after receiving a complaint from Lumbard's counsel. Lumbard has thus "put forward a number of specific, nonconclusory allegations." *Id*. at 399–400. Having met all three elements, Lumbard's retaliation claim also survives dismissal on the pleadings.

Here too, Defendants do not contend that Lumbard's alleged facts, if true, would not amount to a violation of his clearly established constitutional rights. Instead, Defendants make two largely procedural arguments regarding Lumbard's retaliation claim.

Defendants first argue that the district court improperly acted as an advocate for Lumbard, who appeared pro se, by judicially crafting this claim. For pro se litigants, we customarily take a delicate touch in reviewing their claims. Because pro se plaintiffs are not trained in legal technicalities, we generally read pro se complaints liberally. *Wells v. Brown*, 891 F.2d 591, 594

(6th Cir. 1989) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam)).  True, we caution district courts not to overcorrect so as to "conjure up" unpled allegations.  *Id*. (citation omitted).  And had Lumbard not pleaded a retaliation claim in any respect, as Defendants suggest, we would not expect the district court to conjure one up for him.  But that is not what occurred here.  On the second page of his eleven-page complaint, Lumbard alleges that Kane placed him in the "drunk tank" for "playing sick" and due to his mother's calls.  While Lumbard's complaint more clearly makes out a claim for "deliberate indifference," Lumbard does allege facts making out a retaliation claim, albeit without formally characterizing those facts under the retaliation legal rubric.  That practice, albeit imperfect, strikes us as a legal hurdle that should bar a represented party, but not a layman, from proceeding.

That leaves us with Defendants' remaining contention, that Lumbard forfeited his retaliation claim by failing to object to the magistrate judge's report.  *See, e.g.*, *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  This, however, is a general rule of procedure, which we may excuse in the interests of justice.  *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012).  Defendants did not seek summary judgment on Lumbard's retaliation claim, and as a result, the magistrate judge's report did not address whether Lumbard had asserted such a claim.  We conclude that even if Lumbard's failure to object to an issue not raised by Defendants or the magistrate judge rises to the level of forfeiture, the interests of justice excuse it—the district court had "plenary discretion" over the magistrate judge's recommendations, *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976), and it correctly determined that Lumbard sufficiently made out a retaliation claim.  And to the extent the district court's holding was a surprise to Defendants, they could have considered filing a motion for reconsideration (or

14

something like it) with the district court. W.D. Mich. L. Civ. R 7.4(a). But as things stand, we see no error in the district court's reading of the complaint as stating a viable retaliation claim.

### III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.