RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0090p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KARLA HOWELL, as administratrix of the Estate of
Cornelius Pierre Howell,

                      *Plaintiff-Appellant*,

    *v.*

NAPHCARE, INC.; CHRISTINA JORDAN and PIERETTE
ARTHUR, individually and in their official capacities;
JIM NEIL, MATTHEW COLLINI, and DANIEL ERWIN,
individually and in their official capacities in the
Hamilton County Sheriff's Department; JUSTIN HUNT,

                      *Defendants-Appellees*,

> Nos. 21-4132/22-3306

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00373—Douglas Russell Cole, District Judge.

Argued: October 20, 2022

Decided and Filed: May 1, 2023

Before: SUTTON, Chief Judge; STRANCH, and DAVIS, Circuit Judges.

─────────────────

### COUNSEL

**ARGUED:** Megha Ram, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Appellant. Robert W. Hojnoski, REMINGER CO., L.P.A., Cincinnati, Ohio, for the NaphCare Appellees. John B. Welch, ARNOLD TODARO WELCH & FOLIANO, Dayton, Ohio, for the Hamilton County Appellees. **ON BRIEF:** Megha Ram, Elizabeth Bixby, David F. Oyer, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., Rosalind Eileen Dillon, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Chicago, Illinois, Konrad Kircher, RITTGERS & RITTGERS, Lebanon, Ohio, David M. Shapiro, RODERICK & SOLANGE MACARTHUR

JUSTICE CENTER NORTHWESTERN PRITZKER SCHOOL OF LAW, Chicago, Illinois, for Appellant.  Robert W. Hojnoski, Jennifer J. Jandes, Michael J. Caligaris, REMINGER CO., L.P.A., Cincinnati, Ohio, for the NaphCare, Appellees.  John B. Welch, ARNOLD TODARO WELCH & FOLIANO, Dayton, Ohio, for the Hamilton County Appellees.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.  Cornelius Pierre Howell died of a sickle cell crisis while in pretrial custody at the Hamilton County Justice Center on December 9, 2018.  Rather than transport a distressed Howell to a local hospital, nurses and jail personnel placed him in a restraint chair and put him in an observation room in the Jail's mental health unit.  Howell remained strapped to the chair with minimal observation until jail personnel found him dead approximately four hours later.  His Estate sued the nurses, their employer, NaphCare, Inc., the jail personnel, and Hamilton County for, as relevant to this appeal, deliberate indifference to his serious medical needs, excessive force, and failure to train, all in violation of the Fourteenth Amendment.  The district court found that none of the Defendants violated Howell's constitutional rights and granted summary judgment.  We **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** for further proceedings.

## I. BACKGROUND

### A.  Factual Background

On December 2, 2018, Cornelius Pierre Howell was arrested and booked at Hamilton County Justice Center (the Jail).  Over the course of the next week, Howell received two medical screenings from nurses employed by NaphCare, Inc., a private company that contracts with the Jail to provide medical services.  The nurses placed him on the "chronic care list" because of his charted diagnosis of sickle cell disease, and Howell informed them that he typically took Oxycodone for his sickle cell pain, which he stated had worsened during his incarceration.

Howell returned to the medical unit on December 9 after he started a fight with his cellmate.  Video shows that two officers attempted to lead Howell down a hallway, but he

immediately fell to the ground, requiring the officers to pick him up. Again, the officers attempted to assist Howell to an elevator, but he continued to fall to the ground. After leaning him against a wall, the officers placed Howell in a wheelchair and took him to the medical sallyport.

Nurse Christina Jordan first evaluated Howell's cellmate. Meanwhile, Howell exclaimed that he was in pain and "yell[ed], moan[ed], and groan[ed]" in an adjacent room—loud enough that those inside the sallyport could hear his cries. He also stated that he could not feel his legs. Once inside the medical sallyport, Howell continued with more of the same: he yelled, complained of pain in his back and legs, and rated his pain at ten-out-of-ten. Again, he "yell[ed] that his legs wouldn't work." Video shows that Howell continued to slide out of the wheelchair and was eventually left rolling around on the floor.

Jordan ultimately evaluated Howell in the medical sallyport with Officers Hunt and Erwin present. Although Howell refused to take a glucose tablet or provide a urine sample, the nurses did take Howell's vitals. NaphCare's medical director subsequently acknowledged that his respiratory rate of 22 was "abnormal." Jordan reviewed Howell's medical chart, seeing Howell's sickle cell diagnosis and his medical history from previous incarcerations. Howell also told Jordan that he had sickle cell. On two prior occasions at the jail, at least one of which was memorialized in his medical chart, medical staff sent Howell to a local hospital due to sickle cell pain.

In previous jobs and during her time at the jail, Jordan had treated sickle cell patients, and she had received training about sickle cell disease. She knew that "pain [is] the primary symptom of sickle cell" and a sickle cell crisis can manifest as numbness in the legs. Jordan concluded Howell was in pain. But ultimately, she determined that Howell was experiencing "a psych[iatric] issue more than a sickle cell [issue], because [with] sickle cell. . . you're in too much pain to do anything," like moving or yelling. Accordingly, Jordan suggested that Jail officers transport Howell to the psychiatric department for evaluation.

Around 5:40 p.m., officers placed Howell in a restraint chair; at that time, Jordan recorded Howell's blood pressure as 90/56. The Defendants dispute whether the NaphCare

Defendants or the Hamilton County Defendants ordered that Howell be placed in a restraint chair. But all Defendants concede that they did not object to that decision. Next, the officers transported Howell to the mental health unit, placed him in a cell that had a small window on its door, and attached the restraint chair to the wall.

Jail restraint-chair policy required jail officers to perform a "check" every ten minutes. Policy also required officers to consider removing the restrained detainee from the chair every hour, recommended at least ten minutes of limb rotations every two hours "to prevent blood clots," and required access to the restroom and water. The medical staff relied on the officers to complete these checks and to report anything unusual with the restrained detainee. The officers had received some training at the officer academy and at orientation on how to perform observational checks on persons in restraint chairs. Alternatively, one sergeant explained that a "field training officer" conducted restraint-chair monitoring training after the academy. Additionally, the officers received "on-the-job" training, and the policy guidance was distributed with an encouragement to "read it" and "review it". The frequency of checks performed by the medical staff depended on who ordered the detainee to the chair. If medical personnel ordered a restraint chair, medical staff were required to perform a check every fifteen minutes; if jail personnel ordered the chair, medical staff were required to perform a check every two hours.

At approximately 6:06 p.m., Nurse Periette Arthur checked on Howell in the presence of Officers Collini and Erwin. Arthur stated that Howell was still yelling but decided that he did not need further medical treatment. After Arthur's initial check, no NaphCare employee checked on Howell again. From 6:23 p.m. to 8:03 p.m., Officers Collini and Erwin did not perform checks on Howell every 10 minutes; instead, they checked approximately every 20 minutes—six checks in total. Officer Collini performed one more check, approximately an hour later at 9:14 p.m.

The observations of Howell by Collini and Erwin consisted of looking through the "small little window" on the locked door—a view that provided only a side profile of Howell. But the Officers did not enter the cell, and they could not see Howell's eyes and could not tell if he was alive. The Officers thought that Howell was sleeping. In reality, Howell may have already

died.  Collini and Erwin failed to consider Howell for removal every hour, rotate Howell's limbs every two hours, or provide Howell with water or the opportunity to use the restroom. Instead, the Officers falsified entries on the restraint chair log to appear to comply with the policy requiring a check every ten minutes.  At 9:45 p.m., approximately four hours after being placed in the mental health unit, Officers, including Hunt, went to remove Howell from the restraint chair.  The Officers found Howell dead.

Dr. Gretel Stephens, the Hamilton County Deputy Coroner, performed an autopsy the next day.  She determined that Howell died from sickle cell crisis; "once the sickling began" Howell likely died within "minutes."  The Estate's expert, Dr. Martin Steinberg, a sickle cell expert, determined that Howell died as a result of rhabdomyolysis, a common complication of sickle cell disease, onset by a "short period of intense exertion."[1]  Dr. Steinberg opined that a transfer to a hospital "would more likely than not have prevented [] Howell's death."

**B.  Procedural History**

Howell's sister, as administratrix of his estate, sued the NaphCare Defendants—NaphCare, Inc. and Nurses Arthur and Jordan—and the Hamilton County Defendants—Matthew Collini, Daniel Erwin, Justin Hunt, and Jim Neil—for injuries related to Howell's death while he was in pretrial custody.  Pursuant to 42 U.S.C. § 1983, the Estate claims all Defendants violated the Fourteenth Amendment through deliberate indifference to Howell's serious medical need and excessive force.  Defendant Sheriff Neil was sued only in his official capacity for failure to train, inadequate supervision, and ratification.  The operative complaint also includes state law claims for negligence, wrongful death, and survivorship against various Defendants.

The district court granted summary judgment for all Defendants on all federal claims and declined to retain jurisdiction over the remaining state law claims.  The Estate appealed that decision[2] in November 2021 and in January 2022, moved for relief from judgment based on the district court's failure to consider our September 2021 decision in *Brawner v. Scott County*,

---

[1]The NaphCare Defendants' expert opined that Howell died from a sudden cardiac arrest, resulting from a prior chest stab wound that had required open heart surgery a year earlier.

[2]The Estate brought its excessive force claim against all individual Defendants.  On appeal, the Estate contests the district court's judgment on its excessive force claims only as to Nurse Jordan.

14 F.4th 585 (6th Cir. 2021) *cert. denied sub nom.*, *Scott County v. Brawner*, 143 S. Ct. 84 (2022), which changed the standard for deliberate indifference claims under the Fourteenth Amendment. The court denied the motion for relief, finding that under *Brawner*, Defendants were still entitled to summary judgment on the deliberate indifference claim. The Estate again appealed, and we consolidated the appeals.

## II.  ANALYSIS

We review the district court's grant of summary judgment de novo. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021). Summary judgment should be granted if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact such that the movant is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(c)). In our review, we draw all justifiable inferences in the nonmoving party's favor. *Id.* If there is sufficient evidence such that a jury could return a verdict for the nonmoving party, a genuine dispute of material fact exists, and summary judgment is improper. *Id.*

### A.  Deliberate Indifference Claim Against Individual Defendants

Both pretrial detainees, like Howell, and convicted prisoners have a constitutional right to be free from deliberate indifference to their serious medical needs. For a pretrial detainee, the right arises under the Fourteenth Amendment, while a prisoner's right comes from the Eighth Amendment. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018). Until our decision in *Brawner*, this was a distinction without a difference: both groups' claims of deliberate indifference were analyzed under the test formulated by the Supreme Court in *Farmer v. Brennan*. 511 U.S. 825 (1994). *Farmer* requires a plaintiff to satisfy two components—one objective and one subjective. To satisfy the objective component, a plaintiff must show that the individual had an "objectively" serious medical need. *Id.* at 834. The subjective component requires a showing that "an official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed], and he must also [have] draw[n] the inference." *Id.* at 837. *Farmer*'s formulation of the subjective component adopted a standard

akin to criminal-law recklessness and rejected a civil-law recklessness standard that would not require subjective knowledge. *Id.* at 836-37.

While *Farmer*'s criminal-law recklessness standard still governs a prisoner's Eighth Amendment deliberate indifference claim, *Brawner* changed the standard for pretrial detainees under the Fourteenth Amendment, adopting a civil-law recklessness standard that "calls a person reckless who acts or . . . fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 836. *Brawner* reasoned that this change was necessary in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), which drew a distinction between claims brought by pretrial detainees and prisoners. *Brawner*, 14 F.4th at 596. In *Kingsley*, the Supreme Court held that for excessive force claims, a pretrial detainee need only show that the force used was objectively unreasonable, and it rejected a subjective unreasonableness inquiry. 576 U.S. at 392. Applying *Kingsley*'s reasoning, *Brawner* held that a pretrial detainee must make a showing (1) that he had an objectively serious medical need and (2) that each defendant "acted deliberately [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"[3] *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).

An objectively serious medical need includes conditions that have been "diagnosed by a physician as mandating treatment" or that are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)). We have "routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component." *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021). In this case, Howell suffered a sickle cell crisis that, according to Dr. Stephens and Dr. Steinberg, caused his death.

---

[3]After *Brawner*, a panel of this court held that a pretrial detainee must satisfy a third element: that "the prison official knew that his failure to respond [to an excessive risk of harm] would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi v. Lake County*, 29 F.4th 745, 757-58 (6th Cir. 2022). But that language is nearly identical in substance to *Farmer*'s subjective requirement for convicted prisoners: that an "official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed], and he must also [have] draw[n] the inference." 511 U.S. at 837. *Brawner* expressly departed from that standard. We agree with the panel in *Helphenstine v. Lewis County* that *Trozzi*'s "framing of the elements is irreconcilable with *Brawner*," and "[b]ecause *Brawner* was decided before *Trozzi*, *Brawner* controls." 60 F.4th 305, 316-17 (6th Cir. 2023).

After initially being taken from his cell, moreover, Howell continuously fell to the ground, seemingly unable to walk under his own power, complained about numbness and pain in his legs, complained about pain in his back, and rated his pain at ten-out-of-ten, evidencing an "obvious need for medical care." *Id.* at 464 (quoting *Blackmore*, 390 F.3d at 900). Howell's sickle cell crisis, pain, and death undoubtedly satisfy the objective prong.

Moving to the second prong, the Estate must show that the individual Defendants recklessly acted or recklessly failed to act where a reasonable official in their position would have recognized that Howell's serious medical need posed "an unjustifiably high risk of harm." *See Brawner*, 14 F.4th at 596-97 (quoting *Farmer*, 511 U.S. at 836). It is sufficient that the risk is known by the defendant or "so obvious that it should be known." *Id.* at 596 (quoting *Farmer*, 511 U.S. at 836). And the Estate must prove "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* at 598 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). We analyze each Defendant's liability individually. *Greene v. Crawford County*, 22 F.4th 593, 607 (6th Cir. 2022).

### 1. Individual NaphCare Defendants

The Estate claims a genuine dispute of material fact exists as to whether NaphCare Nurses Jordan and Arthur were deliberately indifferent to Howell's serious medical need—Jordan because she failed to send Howell to the emergency room after evaluation and Arthur because her monitoring of Howell in the mental health unit was inadequate.

#### a. Defendant Nurse Christina Jordan

There is no dispute that Jordan knew Howell had sickle cell disease. She saw it in Howell's chart, and he told her during her evaluation. Notably, Jordan had professional experience, "academic," and on-the-job training in treating patients with sickle cell, and she acknowledged that sickle cell crises can manifest in extreme pain and numbness in the arms and legs. A reasonable inference can be drawn that based on her review of Howell's history in his medical chart, Jordan knew that Howell had been hospitalized during previous incarcerations due to sickle cell complications.

Jordan heard Howell's repeated complaints of leg and back pain, and it is reasonable to infer that she also heard Howell's complaints about not being able to feel his legs or that his "legs wouldn't work," because Howell was "yelling" them and other Defendants present heard these complaints. She witnessed Howell fall out of a wheelchair and roll around on the floor. Jordan took Howell's vitals, but there is a dispute of material fact regarding the irregularity of his respiratory rate and blood pressure. Most importantly, Jordan believed Howell was in pain; she did not think he was "faking" his anguish.

To be sure, there were other facts for Jordan to consider. She knew the officers brought Howell for evaluation after he uncharacteristically started a fight with his cellmate, and when reviewing his medical chart, she noticed a previous incident of drug use while incarcerated. Further, Howell refused a glucose tablet and hydration and refused to provide a urine sample.

Based on all these facts, Jordan ordered Howell to be put in a restraint chair and transported to a locked observation cell in the mental health unit; she then failed to check on him. She did nothing to treat Howell for a sickle cell crisis or for his excruciating pain. The Estate's expert opined that Howell's symptoms were well-known complications of sickle cell disease and that a detainee with sickle cell experiencing bad pain represents a medical emergency: "A patient with sickle cell disease complaining of severe pain should never be ignored . . . ." The Estate's experts concluded that Jordan "should have immediately" sent Howell to the emergency department and "even a layperson" would have recognized the risk.

There is no dispute that Jordan subjectively believed Howell was experiencing a psychiatric episode. But after *Brawner*, subjective belief is not the end of the analysis. *Brawner* is satisfied if a jury could find that Jordan acted recklessly by failing to treat Howell's sickle cell disease when it was obvious that he faced an unjustifiably high risk of harm. A jury could make that finding here based on the following facts: (1) Jordan knew Howell had sickle cell; (2) she knew he had previously been transported to a local hospital for sickle cell complications while incarcerated; (3) she observed his inability to stand and saw him fall out of a wheelchair; (4) she heard his complaints about pain in his legs and back and numbness in his legs—common sickle-cell symptoms; (5) she read Howell's irregular vitals; and (6) as expert testimony established, a sickle cell patient complaining of severe pain represents a medical emergency that would have

made it apparent to a layperson that Howell needed to go to the emergency department. Yet Jordan never took further action to rule out a sickle cell crisis. Accordingly, the district court erred in granting summary judgment to Nurse Jordan. *See Greene*, 22 F.4th at 613 (denying summary judgment to jail official that did not seek additional medical assistance); *see also LeMarbe v. Wisneski*, 266 F.3d 429, 437 (6th Cir. 2001) (denying summary judgment where risk "was extreme and obvious" to medical professionals and "most lay people"); *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 481, 485 (6th Cir. 2014) (reversing grant of summary judgment in favor of nurse who believed detainee who died of diabetic ketoacidosis was "probably detoxing").

Jordan argues she is entitled to summary judgment because she reasonably diagnosed Howell as experiencing a psychiatric episode, and a reasonable misdiagnosis does not subject her to liability. The district court granted summary judgment on that basis, holding that her misdiagnosis was not "clearly inconsistent" with Howell's symptoms. The record below reveals disputes of fact over whether and to what degree Howell's symptoms were inconsistent with a psychiatric episode and were instead consistent with a sickle cell crisis.

Under our caselaw, the simple fact that a medical professional misdiagnosed a patient does not rise to the level of deliberate indifference, *Griffith v. Franklin County*, 975 F.3d 554, 573 (6th Cir. 2020), and as a general matter, courts are "reluctant to second guess the medical judgment of prison medical officials," *Jones v. Muskegon County*, 625 F.3d 935, 944 (6th Cir. 2010). Medical officials, however, "may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment." *Id.* (quoting *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008)); *LeMarbe*, 266 F.3d at 439 ("A government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs.")

Our cases clarify the operation of these principles. In *Jones v. Muskegon County*, we determined that a doctor who misdiagnosed a detainee's cancer as constipation was not deliberately indifferent in part because some of the detainee's symptoms were consistent with constipation. 625 F.3d at 945. We held that the doctor's merely negligent misdiagnosis did not rise to the level of "grossly inadequate" care. *Id.* at 945-46. As noted, however, the doctor in *Jones* also "scheduled various exams to determine more precisely what was affecting [the

detainee] and transferred him to the hospital when it was apparent that his condition was worsening." *Id.* at 945.   In *Rouster v. County of Saginaw*, we held that a nurse who misdiagnosed a detainee's perforated ulcer as alcohol withdrawal was not deliberately indifferent in part because "the majority of [the detainee's] symptoms were entirely consistent" with alcohol withdrawal.  749 F.3d 437, 451-52 (6th Cir. 2014).  That opinion reasoned that the medical personnel,

> were ignorant of the single critical fact that might have caused them to interpret [the detainee's] symptoms in a different light:  At no point did [the detainee] tell any member of the medical staff about his previous treatment for a perforated duodenal ulcer.  Had [the medical staff] received full information regarding [the detainee's] medical history, we could easily conclude that [the medical staff defendants] were deliberately indifferent to [the detainee's] needs.

*Id.* at 453.  In a recent unpublished opinion, *Britt v. Hamilton County*, a nurse misdiagnosed a detainee's endocarditis as heroin withdrawal.  2022 WL 405847, at *1-2 (6th Cir. Feb. 10, 2022).  The *Britt* panel held that the nurse was not deliberately indifferent, noting that the detainee's symptoms were undisputedly consistent with heroin withdrawal and the only facts before the nurse at the time of the misdiagnosis were a slightly elevated temperature and pulse rate that was "close to the typical range." *Id.* at *3.  *Britt* explained that the nurse was "far less negligent than other conduct we have held did not create a triable issue of fact on deliberate indifference." *Id.*

The facts in Howell's case are readily distinguishable from these cases.  It is undisputed that, unlike the medical staff in *Rouster*, Jordan knew the critical facts that should have caused her to interpret Howell's symptoms in a different light, 749 F.3d at 453; she knew Howell had sickle cell, heard him make repeated complaints synonymous with sickle cell illness, and the record provides a reasonable inference that Jordan knew about Howell's recent hospitalizations related to sickle cell.  Moreover, unlike the medical professionals in *Jones* and *Britt*, Jordan was faced with multiple symptoms that were unrelated to the misdiagnosis and consistent with the proper diagnosis, yet she failed to undertake any additional evaluation, care, or treatment during or after the misdiagnosis.

Jordan is "not entirely insulate[d] . . . from liability under § 1983 simply" because she made some diagnosis. *Jones*, 625 F.3d at 944 (quoting *McCarthy v. Place*, 313 F. App'x at 814). This record and our precedent do not support the conclusion that a diagnosis as generic as "psychiatric episode," which could cover almost any physiological symptom, can serve as blanket insulation from liability. In the light most favorable to the Estate, a jury could find that Jordan was reckless by failing to act in the face of an obvious, unjustifiably high risk of harm, amounting to deliberate indifference to Howell's serious medical need. We reverse the district court's grant of summary judgment to Nurse Jordan on the Estate's deliberate indifference claim.

### b. Defendant Nurse Pierette Arthur

Nurse Arthur's exposure to Howell was far more limited than Nurse Jordan's. Arthur only interacted with Howell on one occasion when she checked on him immediately after the Officers brought him to the mental health unit in the restraint chair. She did not observe Howell's behavior in the medical sallyport, and the record does not support the inference that Arthur knew Howell had sickle cell disease. Based on Jordan's diagnosis, Arthur believed that Howell was in the restraint chair for a mental health evaluation.

The Estate argues that, given Arthur's knowledge of Howell's low blood pressure, her failure to call a doctor or perform further checks raises a genuine dispute of material fact whether she was deliberately indifferent. In contrast to Jordan, however, Arthur did not know any of the "critical fact[s]" that would have led a reasonable official to recognize the unjustifiably high risk Howell faced. *Rouster*, 749 F.3d at 453. She did not see Howell's demeanor in the medical sallyport or hear his complaints that would have tipped off a reasonable medical professional that he was experiencing a medical crisis. While the Estate is correct that policy dictated Arthur should have checked on Howell every fifteen minutes, and she only checked on him once in roughly 90 minutes, our caselaw states that a "'failure to follow internal policies, without more,' does not equal deliberate indifference." *Hyman v. Lewis*, 27 F.4th 1233, 1238 (6th Cir. 2022) (quoting *Winkler v. Madison County*, 893 F.3d 877, 891 (6th Cir. 2018)). There is not something "more" in this record that pushes Arthur's conduct beyond the level of negligence to deliberate indifference. *Griffith*, 975 F.3d at 570-71. The district court's grant of summary judgment to Arthur on the Estate's deliberate indifference claim is affirmed.

2. Individual Hamilton County Defendants

The Estate claims a genuine dispute of material fact exists whether Hamilton County Defendants Deputy Erwin, Deputy Collini, and Sergeant Hunt were deliberately indifferent to Howell's serious medical need by failing to adequately monitor and observe Howell while he was restrained in a locked cell in the mental health unit.

Our caselaw has recognized that generally "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to [a] medical professionals' opinions.'" *Greene*, 22 F.4th at 608 (quoting *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017)).  Such deference, however, may not be absolute or indefinite, particularly when officers are tasked with monitoring a detainee.  *See, e.g.*, *Stojcevski v. Macomb County*, 827 F. App'x 515, 522 (6th Cir. 2020) (summarizing the relevant law that an officer can rely on a medical opinion for a "reasonable period of time after it is issued, absent circumstances such as the onset of new and alarming symptoms").  Moreover, "[a]t a certain point, bare minimum observation ceases to be constitutionally adequate."  *Greene*, 22 F.4th at 609.

### a.  Defendant Deputy Daniel Erwin

Erwin first saw Howell in the medical sallyport, where he observed Howell "slumped over in the chair," then "sprawled out on the floor," and heard him "making noises."  Other officers present heard Howell "moaning," and yelling that "his legs wouldn't work" and that he "could not feel his legs."  Erwin overheard medical staff and officers debating whether Howell needed to go to the hospital, then he and other officers were ordered to place Howell in a restraint chair and transport him to the mental health unit for "safety and for observation."  Erwin later stated that he thought Howell should have gone to the hospital.

It is undisputed that medical staff made the decision to send Howell to the mental health unit instead of the hospital, and Erwin reasonably deferred to that medical determination.  But importantly, that medical determination relied on the understanding that officers would complete observational checks every ten minutes as required by policy and would alert the medical staff if they saw anything unusual.  It is undisputed that Erwin completed only four checks after his

initial check with Arthur at 6:06 p.m. and before Howell was found dead at 9:45 p.m. He did not complete a check after 8:03 p.m. Between Erwin and Collini, who was also responsible for observing Howell, only seven observational checks were performed during the approximately three-and-a-half-hour period. Policy specified that over 20 checks should have been performed. The Officers instead falsified entries to the restraint chair log, knowingly failing to comply with policy.

The infrequency of the observational checks violated policy. In addition, the methodology of the checks raises concerns. Erwin would "look in the . . . small little window . . . and observe [Howell]" from the left side. Collini testified that on two occasions he could not see Howell's eyes or tell if he was alive, which leads to the inference that Erwin could not either. Erwin never entered Howell's cell, despite having the discretion to do so and despite an abrupt change in Howell's demeanor. Nor did Erwin comply with the policy to offer Howell water and a chance to use the restroom.

The infrequency and inadequacy of Erwin's observational checks is compounded by the record evidence that he knew, or should have known, that Howell faced a high risk of harm. Erwin himself believed that Howell should have gone to the hospital after observing Howell's condition in the sallyport. He knew the medical staff considered sending Howell to the hospital prior to deciding that Howell would be restrained *for further observation*.

Considering these facts, a jury could find that Erwin's actions were the kind of "bare minimum observation" that "ceases to be constitutionally adequate." *Greene*, 22 F.4th at 609. In Erwin's case, there is "more" in the record beyond policy violations, *Hyman*, 27 F.4th at 1238, and a jury could determine that Erwin's actions crossed the line from negligence to reckless disregard. *See Speers v. County of Berrien*, 196 F. App'x 390, 397-98 (6th Cir. 2006) (denying summary judgment where officer heard of detainee's troubling symptoms but only observed the detainee through plexiglass and believed detainee was "sleeping"). The district court's grant of summary judgment to Erwin on the Estate's deliberate indifference claim is reversed.

### b. *Defendant Deputy Matthew Collini*

Unlike Hunt and Erwin, Collini was not present during Howell's evaluation in the medical sallyport; his first interaction with Howell was during Arthur's check around 6:06 p.m., after Howell had been placed in the restraining chair and brought to the mental health unit. He checked on Howell three times, once at 7:24 p.m., once at 7:40 p.m., and finally at 9:14 p.m., and he violated the same internal policies as Erwin during the observation period.

While Collini knew of the general risks a detainee faced in the restraint chair, he did not have the same knowledge as Erwin, who saw Howell's troubling symptoms in the sallyport and heard the medical staff's hospitalization discussion and their orders. While Collini did not see Howell's condition in the sallyport, he did see Howell's condition worsen while he was in the restraining chair, and he did nothing to alert the medical staff. For example, during his third check, Collini testified that Howell's head "was maybe a little more down . . . . More straight down, I guess." As explained, the medical staff relied on the officers to observe and alert them of these changes. Nonetheless, on this record, a jury could not find that a reasonable officer in Collini's position—without knowledge of what precipitated Howell's arrival in the mental health unit—would have recognized an unjustifiably high risk of harm to Howell. *See Brawner*, 14 F.4th at 597. Collini's failure to act and policy violations did not rise above the level of negligence. *See Hyman,* 27 F.4th at 1238. The district court's grant of summary judgment to Collini on the Estate's deliberate indifference claim is affirmed.

### c. *Defendant Sergeant Justin Hunt*

Hunt was present in the medical sallyport while Howell was evaluated. He saw Howell slide out of a chair onto the floor and heard him yell about pain and numbness in his legs and pain in his back. He heard the debate whether to send Howell to the hospital, heard the ultimate decision to keep Howell at the jail for "safety and for observation," and saw officers place Howell in the restraint chair and transport him from the medical sallyport. Hunt did not see Howell again until he came to remove Howell from the restraint chair and found him dead, approximately four hours later.

Like Erwin, Hunt reasonably deferred to the medical staff's judgment not to send Howell to the hospital. But unlike Erwin, Hunt was not responsible for performing the observational checks while Howell was restrained in the mental health unit. To be sure, approximately two hours into the observation period, Collini called Hunt to perform a limb rotation, which required a supervisor, and Hunt did not arrive until two hours later. The Estate faults Hunt for this failure to timely arrive and perform the limb rotation, but the jail's policy did not require a limb rotation, it merely recommended it. At the most, a jury could find that Hunt was negligent given that he reasonably deferred to the medical staff's judgment and was not personally responsible for observing Howell. *Griffith*, 975 F.3d at 570-71. The district court's grant of summary judgment to Hunt on the Estate's deliberate indifference claim is affirmed.

### 3. Qualified Immunity

In response to the deliberate indifference claim, the individual Hamilton County Defendants assert qualified immunity.[4] Qualified immunity operates to shield government officials from liability for their actions unless the officials are on notice that those actions are unlawful. *See Occupy Nashville v. Haslam*, 769 F.3d 434, 441-42 (6th Cir. 2014). To overcome the Officers' claims to qualified immunity, the Estate must show that (1) the Officers violated one of Howell's constitutional rights and (2) that right was clearly established. *Id.* at 442. As explained above, the Estate fails to carry its burden of showing a constitutional violation on the part of Deputy Collini and Sergeant Hunt, so they are entitled to qualified immunity. But because a jury could find that Deputy Erwin violated Howell's constitutional right to be free from deliberate indifference to his serious medical need, we analyze whether that right was clearly established in 2018. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Burwell*, 7 F.4th at 476 (cleaned up). The illegality of the conduct must be apparent considering "pre-existing law, but we need not find a case in which the very action in question has previously been held unlawful." *Id.* at 476-77 (cleaned up).

---

[4]Nurses employed by a private medical provider, like NaphCare, are not entitled to assert qualified immunity. *Harrison*, 539 F.3d at 524.

"As early as 1972, we stated that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" *Id.* at 477 (citing *Est. of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)). "Furthermore, we reiterated in 2013 that it is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by a medical provider or an officer." *Helphenstine*, 60 F.4th at 327 (quoting *Greene*, 22 F.4th at 615). Under comparable circumstances, in *Phillips v. Roane County*, we denied qualified immunity to officers who inadequately monitored an inmate exhibiting signs of a serious medical condition. 534 F.3d 531, 540-41, 545 (6th Cir. 2008). The officers were tasked with monitoring the inmate in an observation room, observed her concerning symptoms, and disregarded prison protocols, ultimately leading to a failure to pursue further medical intervention. *Id.* at 540-41. The same is true in this case; Erwin observed Howell's condition, was tasked with monitoring him, and failed to follow policy in doing so, which a jury could find amounted to deliberate indifference. We hold that Erwin was sufficiently on notice that such conduct was unlawful and is not entitled to qualified immunity.

**B.** *Monell* **Claims**

The Estate also brought claims against NaphCare, Inc., and Hamilton County pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The Estate argues that NaphCare had a custom of authorizing its nurses to order restraint chairs, which practice led to Howell's inadequate medical care. As for the County, the Estate contends it was deliberately indifferent in failing to train its officers on proper restraint-chair monitoring. The district court granted summary judgment to both Defendant entities.

1. Custom Claim Against NaphCare

A private corporation performing traditional state functions can be held directly liable under § 1983 if its customs, practices, or policies led to a constitutional deprivation. *Winkler*, 893 F.3d at 904. A custom that has not been formally approved may still serve as a basis for liability if "the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). The Estate bears "a heavy burden

in proving municipal liability, and [it] cannot rely solely on a single instance to infer a policy of deliberate indifference." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005).

The Estate argues that "there is evidence showing that nurses routinely ordered restraint chairs," and that custom "caused the denial of adequate medical care" to Howell. If such a custom existed, it violated jail policy that the "application of any clinically ordered restraints must be ordered by an advanced clinical provider." The Estate contends that this caused Howell's injury because if Jordan had complied with policy, a doctor would have been contacted and that doctor likely would have ordered Howell to the emergency room.

The Estate points to only one piece of deposition testimony that, according to a corrections officer, shows that it was "typical for nurses to be the ones who are authorizing the restraint chair." Notably, this single piece of evidence does not make clear that it was "typical" for nurses to order restraint chairs *without* first receiving authorization from an advanced medical provider, which the policy permitted to be provided "in writing or via telephone consultation." That testimony alone is insufficient to show a genuine dispute of material fact as to whether there was a custom of nurses ordering restraints in violation of policy that was "so widespread as to have the force of law." *Brown*, 520 U.S. at 404.

The district court's grant of summary judgment to NaphCare on the Estate's *Monell* claim is affirmed.

### 2. Failure to Train Claim Against Hamilton County

The Estate sued Sheriff Neil in his official capacity under a failure-to-train theory, a claim that amounts to suit against Hamilton County itself. *Leach v. Shelby County*, 891 F.2d 1241, 1245-46 (6th Cir. 1989). A municipality may be liable under § 1983 for failure to train when it amounts to deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). To succeed on a failure-to-train claim, a plaintiff must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Regarding the second prong, a plaintiff most commonly demonstrates a

municipality's deliberate indifference by pointing to a failure to act "in response to repeated complaints of constitutional violations by its officers." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)).  But a plaintiff can rely on a single incident to establish liability in a narrow range of circumstances "if the risk of the constitutional violation is so obvious or foreseeable" that it amounts to deliberate indifference for the municipality to fail to prepare its officers for it.  *Id.* The Estate relies on this latter route to show the County's deliberate indifference.

The Estate initially argues that the County did not provide *any* training on restraint-chair monitoring, but ultimately argues that the County only provided limited on-the-job training that was inadequate.  Three types of training regarding observation of inmates in restraint chairs were evinced by the record:  training at correctional officer academy; training at orientation; and on-the-job training.  One sergeant testified that training was offered by a "field training officer" after the academy.

Collini stated that he received training at the academy and received ongoing on-the-job training; Erwin received the same and showed an awareness and familiarity with the restraint chair policies.  Based on the record, it is difficult to ascertain the substance of these trainings— formal or informal—and the Estate's expert only provides in conclusory terms that the County "failed to properly train and supervise" officers on the "proper supervision and careful observation of inmates" in restraint chairs.

To support its proposition that the County's training was inadequate, the Estate primarily relies on *Shadrick v. Hopkins County*, which held that a jail medical provider inadequately trained its nurses by providing only "some limited on-the-job-training."  805 F.3d 724, 740 (6th Cir. 2015). But *Shadrick* contained no indication that the nurses received "any type of ongoing training"; the only training provided appeared to be "some limited on-the-job training when beginning their employment, such as learning where supplies were kept."  *Id.*  They also did not receive any feedback or evaluations based on their performance.  *Id.*  Finally, none of the nurses, including their supervisor, could identify any of the requirements of the written policies that governed their work.  *Id.*  The record in *Shadrick* reveals that the "limited on-the-job

training" offered at the beginning of the nurses' employment on housekeeping issues amounted to no training at all.

On this record, we cannot say the same is true regarding the County's training on restraint-chair monitoring. The County offered initial training, and, while it did rely on on-the-job training, that training was ongoing. The Officers displayed knowledge of and familiarity with the relevant polices that governed restraint chairs, which the Estate's expert agreed were reasonable and appropriate. Finally, "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Connick v. Thompson*, 563 U.S. 51, 68 (2011). Contrary to the Estate's argument, the County did not wholly fail to train its officers on restraint-chair monitoring. The Estate has failed to show a genuine dispute of fact regarding whether the training was deficient in substance. The Estate's failure-to-train claim against the County fails at prong one, and the district court's grant of summary judgment is affirmed.

## C. Excessive Force Claim Against Nurse Jordan

The Estate brought an excessive force claim against Jordan, claiming that her use of the restraint chair violated Howell's Fourteenth Amendment rights. To succeed, the Estate must show "that the force purposely or knowingly used against [a pretrial detainee] was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97. The reasonableness of the force turns on the facts and circumstances of the particular case, and "[a] court must make this determination from the perspective of a reasonable [official] on the scene, including what the [official] knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397. Factors that may bear on the reasonableness analysis include:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

In the light most favorable to the Estate, Jordan ordered Howell into the restraint chair around 5:40 p.m., and it is undisputed that he remained in the chair for approximately four hours

without any further check by Jordan.  There is no evidence any force more than necessary was used to place Howell in the chair.  Regarding the propriety of ordering a restraint chair based on Howell's symptoms,  NaphCare's Health Services Administrator opined that "[y]elling, [falling] on the floor, rolling around," and "non-complian[ce] with medical care" would not be grounds to place a detainee in a restraint chair, but "it depends on the events that led up to this [behavior]," and on "what was going on at that time."

Neither party cites authority from this court analyzing the failure to remove a detainee from a restraining chair in the context of an excessive force claim.  The Estate relies on *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2013), a case authored by then-Judge Gorsuch. *Blackmon* recognized that "the government may have a legitimate interest in ensuring the safety and order of the facilities where it houses pretrial detainees" and restraints can aid that interest even if they cause discomfort but noted that very harsh conditions might not be reasonably related to "any purpose except punishment." *Id.* at 1241 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20, 540 (1979)).  In *Blackmon*, the defendants were denied summary judgment because on some occasions they restrained the plaintiff to a chair "without *any* legitimate penological purpose." *Id.* at 1242 (emphasis in original).  This included occasions where the plaintiff had been restrained "for extensive periods after any threat of self-harm had dissipated." *Id.*  The Estate argues that Jordan's initial order to place Howell in the restraint chair and the subsequent failures to check on Howell are analogous to the facts in *Blackmon*.  It contends that, based on the record, a jury could find there was no legitimate purpose for putting Howell in the chair and Howell was left in the restraint chair long after "any threat . . . had dissipated."

Logic supports consideration of the Estate's excessive force claim as distinct from the inadequate-medical-care claim.  Excessive force raises the question of what harm Howell incurred based on Jordan's decision to place him in the restraint chair, instead of a decision that did not involve the force inherent in restraints, such as returning him to his cell or leaving him unrestrained in an observation room.  Regarding the harm caused to Howell, the Estate's expert, Dr. Steinberg, concluded, "I don't think it was the restraint chair itself.  I think it was . . . the lack of observation during this time."  Indeed, the Estate did not contend that "the restraint chair killed Howell"; rather, that "Defendants killed Howell through their deliberate indifference to his

serious medical condition while left alone in the chair." The record suggests that Howell's injury was caused by the failures to send him to the hospital and to properly monitor him. Whether those failures violated Howell's constitutional rights is properly analyzed in the Estate's deliberate indifference claim.

Given that Jordan determined Howell would not be sent to the hospital—again, a decision that is scrutinized in the inadequate-medical-care context—it was not objectively unreasonable to order Howell to a restraint chair for his safety and observation and for him to remain restrained for four hours. *Cf. Grinter v. Knight*, 532 F.3d 567, 573-74 (6th Cir. 2008) (holding that a convicted prisoner did not have a due process liberty interest in freedom from being restrained for four hours). Weighing the appropriate factors, the Estate has not shown a genuine dispute of material fact that Jordan used excessive force against Howell. *See Kinglsey*, 576 U.S. at 397. The district court's grant of summary judgment to Jordan on the excessive force claim is affirmed.

### D. State Law Claims

In addition to the federal claims analyzed in this opinion, the Estate brought state law claims against the Defendants. After granting summary judgment in favor of Defendants on the Estate's § 1983 claims, the district court declined to retain supplemental jurisdiction over remaining state law claims. Because we reverse the district court's grant of summary judgment regarding Nurse Jordan and Deputy Erwin, we also reverse the district court's dismissal of the state law claims regarding those Defendants. *See, e.g.*, *Helphenstine*, 60 F.4th at 327. On remand, the district court should reconsider its decision to decline supplemental jurisdiction over these state law claims against Jordan and Erwin. *See id.*

### III.  CONCLUSION

The district court erred in granting summary judgment to Nurse Jordan and Deputy Erwin on the Estate's deliberate indifference claims, because, pursuant to *Brawner*, a reasonable jury could find that they recklessly failed to act to mitigate an unjustifiably high risk of harm to Howell that a reasonable official would have recognized. Erwin was not entitled to qualified immunity. Otherwise, the district court properly granted summary judgment on all other claims.

We therefore **REVERSE IN PART** and **AFFIRM IN PART** the district court's grant of summary judgment, and **REMAND** for further proceedings consistent with this opinion.